## COURT OF APPEALS.

Thomas Darlington, respondent agt. The Mayor, &c., of the city of New York, appellants.

The act of the legislature entitled "an act to provide for compensating parties whose property may be destroyed in consequence of mobs or riots," passed April 13th, 1855, is a valid and constitutional act of legislation.

Darlington agt. The Mayor, &c., of New York.

Judgments rendered pursuant to the provisions of that act, for riot damages, have the same force against the property of the city as judgments recovered for any other cause of action.

The property owned by the city corporation is held by it as a public corporation, and is subject to the law-making power of the state vested in the legislature.

This was an action brought under the riot act of 1855 (*Laws of* 1855, *ch.* 428, *p.* 800), to recover damages against the city of New York, for the destruction of the plaintiff's property by a mob, during the riot of July, 1863. At the trial before Judge Moncrief, the plaintiff was non-suited, but the general term (of the superior court) set aside the non-suit and ordered a new trial. The appeal was from that determination.

John K. Hackett *and* William Fullerton, *for the appellants.*

Thomas Darlington, *respondent in person.*

Denio, C. J. I am of opinion that the act of the legislature under consideration did not require the presence of three-fifths of the members elected to each house in order to become a law. The constitutional provision on which reliance is placed, is in these words : " On the final passage in either house of the legislature of every act which imposes, continues or revives a tax, or creates a debt or charge, or makes, continues or revives an appropriation of public or trust money or property, or releases, discharges or commutes any claim or demand of the state, the question shall be taken by ayes and noes, which shall be duly entered on the journals, and three-fifths of all the members elected to either house, shall, in all such cases, be necessary to constitute a quorum therein " (*Const. Art.* 7, § 14). The article of which the section is a part, relates to the state finances, and taken together it constitutes the financial system of the state, so far as relates to constitutional restraints.

The affairs of cities and counties so far as they are regu-

lated by the constitution, are treated in other provisions (*see The People* agt. *The Supervisors of Chenango*, 4 *Seld*. 317). This act of 1855 does not impose a tax of any kind either state or municipal.   Its provisions may and no doubt will lead to the necessity of local taxation, and the same thing may be said of every act of legislature under which an expenditure for general or local purposes may in any contingency be required.   If a local tax in a city or village is within the scope of the section, it will be sufficient to have the requisite quorum present when the law shall come to be voted.   The act does not create a debt or claim.   If no person should suffer damage by a riot or mob, no money would be required, and no debt or charge would ever be created, and until such an event shall occur, no debt or claim will be called into existence.

The legal principle which imputes the act of an authorized agent to his principal, does not apply to the rioters contemplated by the statute, whose wrongful act might lead to the incurring of a debt.   They would not be in any sense the agents of the legislature.   The constitution relates to legislative acts, which of themselves, or by their immediate and necessary consequence create a debt or claim. Nor is the act an appropriation bill in the sense of this provision.   No public or trust moneys were disposed of or set apart for the purpose of being expended ; it could not be known when, if ever, any payment of money would be required to be made, or in what county or city it would be required ; and none of the public moneys of the state were to be expended in consequence of any of the provisions of the act.   The other purposes included in the section are still more remote from, and indeed, have no relation to any provision of the act in question.   Some of these positions were adjudged in the case referred to, and the others seem to be sufficiently plain.

The other objection is, that by force of the act, if it shall be executed, what is termed the private property of the

city, may be taken for a public use without due process of law, and without a provision for compensation. It cannot be doubted but that the general purposes of the law are within the scope of the legislative authority. The legislature have plenary power in respect to all subjects of civil governments, which they are not prohibited from exercising by the constitution of the United States, or by some provision or arrangement of the constitution of this state. This act proposes to subject the people of the several local divisions of the state, consisting of counties and cities, to the payment of any damages to property in consequence of any riot or mob within the county or city. The policy on which the act is framed may be supposed to be, to make good at the public expense, the losses of those who may be so unfortunate, as without their own fault to be injured in their property by acts of lawless violence of a particular kind, which it is the general duty of the government to prevent; and further, and principally, we may suppose, to make it the interest of every person liable to contribute to the public expenses to discourage lawlessness and violence, and maintain the empire of the laws established to preserve public quiet and social order. These ends are plainly within the purposes of civil government, and, indeed, it is to attain them that governments are instituted; and the means provided by this act seem to be reasonably adapted to the purposes in view. If this were less obvious, the practice of the country from which we derive so many of our legal institutions, would leave no doubt on the subject. Laws of this general character have existed in England from the earliest period. It was one of the institutions of Canute, the Dane, which was recognized by the Saxon laws, that when any person was killed, and the slayer had escaped, the ville should pay forty marks for his death; and if it could not be raised in the ville, that the hundred should pay it. " This irregular provision," says an able author, " it was thought would engage every one

in the prevention and prosecution of such secret offences"
(1 *Reeve's History of English Law, p.* 17). Coming down
to the reign of the Norman kings, we find in the statute
of Winchester (13 *Ed.* 1, *ch.* 1), a provision touching the
crimes of robbery, murder and arson—that if the country,
*i. e.,* the jury would not answer for the bodies of the offend-
ers, the people dwelling in the county were to be answerable
for the robberies and the damages sustained, so that the
whole hundred where the robbery was committed, with the
franchises thereof, should be answerable. It is upon this
statute that the action against the hundred for robberies
committed therein, of which so many notices are met with
in the old books, is grounded. (*Reeve, Vol.* 1, *p.* 213;
*Second Ins. ch.* 17, *p.* 569.)

Passing by the statutes of subsequent reigns, and par-
ticularly several in the reign of Elizabeth, in which this
remedy has been somewhat modified while its principle is
steadily adhered to, we come to the 7th and 8th, *Geo. IV,*
*ch.* 31, which was an act for consolidating and amending
the laws of England, relative to remedies against the hun-
dred. It repeals several prior acts providing remedies
against the hundred for the damages occasioned by per-
sons violently and tumultuously assembled, and enacts a
series of provisions very similar in effect with, and in some
respects more extensive in their scope than those of the
statute under consideration. As the hundreds were not
corporations, the action was to be brought against the
high constable, and on judgment being rendered, the sheriff
was to draw his warrant on the county treasurer for the
amount of the recovery. Ultimately, the money was to be
collected by local taxation in the hundred made liable.
These provisions have no direct bearing upon the present
case, but are referred to to show that the action in ques-
tion is based upon a policy which is coeval with the laws
of England, and one which has been constantly acted on

in that country, and hence that it very clearly falls within the general powers of the legislator.

As, however, the objection of the defendant arises out of a constitutional restraint, substantially identical with one of the provisions of *Magna Carta* (*ch.* 29), it is at least a curious coincidence that the policy of compelling a local community to answer with their property for acts of violence committed by others, has been considered by the English parliament as a supplement to rather than a violation of the great charter.

In the statute called *Articuli super cartam*, Anno 28, Edward I, which confirmed the great charter and the charter of the forest, and directed that the same should be firmly observed " in every part and article," it was directed in terms that the statute of Winchester, which gave a remedy against the hundred for robberies committed in it, should be sent again into every county to be read and published four times a year, and kept in " every point as strictly as the two great charters, upon the pains therein limited." (*Reeve, vol.* 2, *p.* 340; *Coke,* 2 *Inst. ch.* 17, *p.* 369.)

Assuming it to be sufficiently apparent that the statute in question falls within the general scope of legislative authority, the particular inquiry is, whether it violates the constitutional provisions relied on by the defendant. It is plain enough that the suits which it authorizes, will, if successful, result in requiring contributions from the tax payers of the local communities, to make good the losses of persons who have suffered from the acts of rioters. In that way it may be said that their property may be taken. In one sense it may be conceded that it is taken for a public use, for when the state undertakes to indemnify the sufferers from riots, the executing of that duty is a public concern, and the expenditure is on public account. It is a public use in the same sense as the expenditure of money for the erection of court houses and jails, the construction of roads and bridges, and the support of the poor. It is

taken for an object which the legislature has determined to be of public importance, and for the interest of the state. Private property thus taken is not seized in the execution of the right of eminent domain.   If it were so considered, all contributions exacted from citizens for defraying the expenses of the government and of local administration, would in order to be legal, require the return of a precise equivalent to the tax payers, or a compensation which would be absurd.   Every one will at once see that this cannot be so, and that if it were government could not be carried on at all.   But no general reasoning is necessary, for the subject has been elaborately considered and determined in this court.

In the case of *The People* agt. *The Mayor, &c., of Brooklyn* (4 *Comst.* 419), a local assessment made pursuant to an act of the legislature, for defraying the expenses of improving a street, was challenged on the same ground as the present act.   The money of individuals having property in a certain locality was required to be taken and appropriated for the public purpose indicated; and it was argued that it was a taking of private property otherwise than by due process of law, and without any provision for compensation.   The opinion of Judge RUGGLES, which was concurred in by all the judges, discriminates with great clearness between the seizure of property under the power inherent in the government to levy taxes for public purposes, and the taking of specific real or personal estate, either unlawfully or for a public object, without rendering a specific equivalent.   In the former case, the contributors to the public burthens receive such compensation as the constitution of the laws contemplate they should have, in the benefits of good government, and in the advantage which the legislature have judged that they would receive from the particular expenditure in question.  It is only necessary to add to this branch of the case that the legislature is the conclusive and final judge as to what the

public interest and general good require to be done, and of the expenditure which may be needed for any particular purpose. The principle which of itself is sufficiently obvious, has moreover been repeatedly affirmed in this court. (*The Town of Guilford* agt. *The Board of Supervisors of Chenango County*, 3 *Kern.* 143; *Brewster* agt. *The City of Syracuse*, 19 *N. Y.* 116.) There can be no objection to imposing the burthens which shall arise in the execution of the act upon the local division where the riots took place and the losses occasioned. This is the case with all public exactions, which from their nature are local in their objects, and which generally arrange themselves under the head of town, city or county charges. If we look at the statute we are examining, as resulting ultimately in occasioning taxation, for the means of raising the money which will be required to carry out its purposes, the foregoing observations will be all which it seems to me necessary for the determination of this appeal, and I am of opinion that it should be considered in that light.

But it is contended that the application of the case to the city of New York raises a farther and different question. The fact that it is governed by a corporation under a charter, conferring certain municipal rights, does not of course, raise any distinction. The authority of the legislature prevails within the limits of charted cities and villages, and the public laws have the same force there as in the other parts of the state. That position does not admit of an argument (*The People* agt. *Morris*, 13 *Wend.* 325).

The particular point appears to be that the form of the remedy for recovering the money required to pay individual losses, provided by the act, leads to consequences which would violate the constitutional provision. The party who has sustained damages by a riot may prosecute the city corporation, and the act provides that if he obtain judgment, the city treasurer is to pay the amount and charge it to the city. It is argued that it may happen that there

will be no moneys in the treasury, or the treasurer may be unable or unwilling to make the payment, but the plaintiff having a judgment against the corporation, may cause an execution to be levied upon its property. The property of the city it is further argued, is private property, which the corporation holds by the same title as an individual or a private corporation, and that it is equally under the protection of the constitution. The effect of the act, as it is urged, therefore, is the same as though the property of one designated private citizen should be directed to be seized and appropriated to pay a local public charge. This it is plain could not be justified under the taxing power, as any other head of legislative authority.

The answer made to this argument in the printed opinion of the superior court, is that the method of collecting the judgment by application to the treasurer, is exclusive, and that property cannot be taken on execution upon such judgments. This answer is not entirely satisfactory to my mind. By permitting the party who had sustained damages to recover judgment in the ordinary course of justice, without any provision qualifying the effect of such judgment, it cannot, I think, have been intended to withhold from him any of the legal rights of a judgment creditor. The most universal of these rights is that of levying the amount of the judgment against the property of the debtor by the usual process of execution. If it were intended to exclude that remedy, it is difficult to see why a judgment should be permitted to be recovered at all. Without that effect the judgment would be illusory in many cases, for it would rarely if ever happen that there would be funds in the treasury adequate and applicable to the payment of such damages, where they should be for a considerable amount. My opinion is that the judgment is of the same force and efficacy as any other judgment which may be rendered against the city, subject perhaps to the duty of first presenting to the treasurer.

It is plain enough that it would not be a judicious administration of the affairs of a city to permit its property to be subjected to a forced sale on execution, and hence it has become a usual practice to add to the sums included in the annual tax levy any amount for which judgments have been recovered against the corporation, and to authorize the borrowing of money, if necessary, in order to pay such judgments.. Instances of such legislation occur in many of the recent statutes. (*Laws of* 1863, 411, § 6; *Laws of* 1864, *pp.* 938, § 1, 946, § 5.) A municipal corporation, equally with a private corporation, may have its property taken in execution, if payment of a judgment is not otherwise made. I am far from supposing, however, that such estate real or personal, as may by law or by authorized acts of the city government, be devoted to public use, such as the public edifices, or their furniture or ornaments, or the public parks or grounds, or such as may be legally pledged for the payment of its debt, can be seized to satisfy a judgment. Such clearly cannot be the case, for these structures are public· property, devoted to specific public uses, in the same sense as similar subjects in the use of the state government. The argument that I am examining supposes that the city may possess other property held for purposes of income or for sale, and unconnected with any use for the purposes of the municipal government. Such property the defendant's counsel insists, and for· the purpose of the argument I concede, is subject to be levied on and sold to satisfy a judgment rendered against the city corporation.

The true answer to the position that such seizure would be a violation of the constitutional protection of ·private property is, that it is not private within the sense of that provision. · City corporations are emanations of the supreme law making power of the state, and they are established for the more convenient government of the people within their limits. In this respect, corporations chartered by the

crown of England, and confirmed at the revolution, stand on the same footing with similar corporations created by the legislature. Their boards of aldermen and council-men, and other officers, are as truly public officers as the boards of supervisors, or the sheriffs and clerks of counties, and the property intrusted to their care and management is as essentially public property as that confided to the administration of similar official agencies in counties and towns. In cities, for reasons partly technical, and in part founded upon motives of convenience, the title is vested in the corporate body. It is not thereby shielded from the control of the legislature as the supreme law making power of the state. Let us suppose the city to be the owner of a parcel of land not adapted to any municipal use, but valuable only for sale to private persons for building purposes, or the like. No one I think can doubt but what it would be competent for the legislature to direct it to be sold, and the proceeds to be devoted to some municipal or other public purpose within the city, as a court house, a hospital, or the like, and yet if the argument on behalf of the de-fendant is sound, it would be the taking of private property for public use without compensation, and the act would be void.

What has been actually done respecting such city property in the present case, if a judgment for riot damages has the effect which the argument supposes, and which I attribute to it, is to render it liable to sale or execution, to satisfy a liability of the city arising under the riot act; and this has been done under the express authority of the legislature. The vice of the argument of the defendant is, that it assimilates the condition of the city, in respect to the property to which it has title, to that of an individual or a private corporation, and denies to the legislature any power over it which it would not possess over the fortunes of a private citizen. I have stated my views in opposition to this theory in rather a dogmatic manner, but it has not

been done without an examination of the cases which we have been referred to, and such others as have been within my reach, and as much reflection as I could bestow on the subject. I will state in a very brief manner the effect of these authorities.

In the case of *Woodward* agt. *Dartmouth College* (4 *Wheat.* 518), the particular question was whether the legislature of the state of New Hampshire was warranted in passing certain statutes, altering in many important particulars, the charter of the corporation of Dartmouth College, and assuming to regulate the execution of its corporate franchises according to its views of public expediency. It was claimed by the college that this legislation was prohibited by the provision of the constitution of the United States declaring the inviolability of contracts, and the answer to that claim was that the college was a public institution of the state of New Hampshire, and hence subject to the control of the law making power of that state. The main question, therefore, was whether it was a private or public corporation. The judgment was that although it was in a limited sense public, as an artificial being, existing by virtue of the laws, and in this respect partook of the public character which belongs to all corporations, yet when looking to the power of the state, it was to be regarded as a private corporation, such as a bank or manufacturing company.

It is not important to point out the manner in which this conclusion was reached, as the case is here referred to only with a view to the distinction between the two classes of corporations, and the authority of the legislature over them respectively. On behalf of the state of New Hampshire, it was argued that the prohibitory provision of the constitution should not be understood to comprehend the political relations between the government and its citizens, or offices held within the state for state purposes, or these laws concurring civil institutions, which it was said might

change with circumstances, and be modified by act of the legislature. Chief Justice MARSHALL said, that the general correctness of these positions could not be doubted, and he added, " that if the act of incorporation be a grant of political power; if it create a civil institution to be employed in the administration of the government; or if the fee of the college be public property; or if the state of New Hampshire, as a government, be alone interested in .its transactions, the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of its powers imposed by the constitution of the United States." But he held that so far from this, the college was a private eleemosynary institution, the body corporate possessing the whole legal and equitable interest, and possessing civil rights which were protected by the constitution. Mr. Justice WASHINGTON said, " that there were two kinds of corporations aggregate, viz. : such as were for public government, and others of a private character." " The first," he said, " are those for the government of towns, cities, or the like, and being for public advantage, are to be governed according to the laws of the land." These, he said, were mere creatures of public institution, created exclusively for public advantage. It would seem reasonable, he proceeds to say, that such a corporation may be controlled, and its constitution altered and amended by the government, in such manner as the public interest may require. Such legislative interference cannot be said to impair the contract by which the corporation was formed, because there is in reality but one party to it, the trustees or governors of the corporation being merely the trustees for the public, the *cestui que trust* of the corporation. (*See Story's Commentaries on the Con.* § 1, 387 ; 2 *Kent's Com.* 275.) The expression of Chancellor KENT here referred to, that where a municipal corporation is empowered to have and hold private property, such property is invested with the security of other private rights,

is understood to mean only that it possesses such rights against wrong doers, and not that it is exempted from legislative control. These trustees or governors have no rights, interests, privileges or immunities, which are violated by such interference. Justice Story, in the place cited, expressed himself to a similar effect, and mentioned towns, cities and counties, as instances of public corporations which were subject to legislative control. Similar citations from adjudged cases, and systematic works might be added, but it is presumed that the principle will not be questioned. The statutes of this state furnish instances too numerous for citation of the interference of the legislature with the corporate government of the city of New York. If the charter like that of Dartmouth College, was private and independent of legislative interposition, these acts would be void upon the principle of the judgment of the case cited, and the regulation of the government would be confined to the brief prescriptions contained in the charters of the colonial governors.

But it is not fair to impute to the defendant's counsel a position so extravagant. They rely upon a supposed distinction between the rights and powers of the corporation in the execution of what is conceded to be its political and municipal acts, and its title to, and its rights and powers over the property within its control. In respect to its powers, the corporate body is admitted to be the trustees of the people, represented by the supreme legislative power of the state, but in regard to its property it is argued that there are no beneficiaries. The property, it is insisted, is private, and hence the legislature has no legitimate control over it. If this is a sound position, the judgments which are every day rendered against the city for neglect of its corporate duties in respect to the streets and public places, and for the nonperformance of its contracts, and for other causes of action, not only cannot be satisfied out of the property of the city, but an act of the legislature which

should require its sale and application to the payment of such judgments, would be the taking of private property for public use, without any provision for compensation, and would be illegal and void. The *sinking fund* which has been created by legislative authority to protect the public debt of the city would be an unconstitutional and a void creation. But in what sense can this city property be said to be private? It certainly does not belong to the mayor, or any or all of the members of the common council, nor to the common people as individual property (*Roosevelt* agt. *Draper*, 23 *N. Y.* 318). If one of these functionaries should appropriate it or its avails to his own use, it would be the crime of embezzlement, and if one of the people not clothed with official station should do the like it would be the offence of larceny. Should it be said that like all corporate property it belongs to the ideal being the corporation, and that its title is beneficial and not fiduciary, that answer would not avoid the difficulty. Indeed it would not be sound. A corporation as such has no human wants to be supplied. It cannot eat or drink, or wear clothing, or live in houses. It is the representative or trustee of somebody, or of some aggregation of persons. We cannot conceive the idea of an aggregate corporation which does not hold its property and franchise for some use, public or private. The corporation of Dartmouth College was held to be the trustees of the donors or of the youth needing education and moral and intellectual training. The corporation of New York, in my opinion, is the trustee of the inhabitants of that city. The property, in a general and substantial, although not a technical sense, is held in trust for them. They are the people of this state—inhabiting that particular subdivision of its territory—a fluctuating class, constantly passing out of the scope of the trust by removal and death, and as constantly renewed by fresh accretions of population. It was granted for their use and is held for their benefit. The powers of local government

committed to the corporation are precisely of the same character. They were granted, and have been confirmed and regulated for the good government of the same public, to preserve order and obedience to law, and to ameliorate and improve their condition, and subserve their convenience as a community.

There are a few cases which countenance to a certain extent the views of the defendants' counsel, which will be briefly noticed. In *Bailey* agt. *The Mayor, &c., of the city of New York* (3 *Hill*, 531), an action was brought to recover damages against the city for an injury to the plaintiff's land in Westchester county, occasioned by the breaking away of a dam across the Croton river, which had been erected by certain officers called the water commissioners, under whose directions the great work of introducing pure and wholesome water into the city had been conducted. The allegation was that the dam had been unskillfully built. The legal question was whether the city was so connected with the work as to be liable for the wrong. The commissioners were appointed by an act of the legislature to report a plan of the work. This was to be submitted to the common council, and to be subjected to the vote of the electors of the city for their approval or rejection. It was approved, and the enterprise which included the building of this dam, was then carried on by the legislative commissioners pursuant to the acts, under the direction of the common council. At the circuit the judge held that the action could not be sustained against the city, and nonsuited the plaintiff. The supreme court set aside the nonsuit, and the opinion of the court prepared by Chief Justice NELSON, contains the doctrine on which the defendants rely. The learned chief justice stated the question to be in effect, whether the powers brought into exercise in constructing the work, were conferred for public purposes exclusively, in which case, he said, they would belong to the corporate body in its public, political or municipal

character, or whether, on the other hand, those powers were conferred for purposes of private advantage or emolument.  If the former were the true theory, he considered that the defendants were not responsible, but that in the latter case they would be, and he held that the defendants were to be regarded in respect to this work as a private company, like a bank or railroad corporation, and consequently that the corporation was liable for the negligence of the water commissioners.  He conceded that there was in the enterprise a blending of public and private objects, which created some difficulty in the mind, but said that upon the whole the distinction was quite clear and well defined, and the power of separation practicable.  He referred to a number of cases, commencing with *Dartmouth College* agt. *Woodward*, and including *Moodamay* agt. *The East India Company* (1 *Brown Ch. Rep.* 469), which last case he stated very much at large as defining the distinction very clearly, and being quite decisive upon the question. It was an action upon a lease, which the defendants had given to the plaintiff, permitting him to supply the inhabitants of Madras with tobacco for ten years, which it was alleged the defendants had illegally revoked, and had granted the privilege to another.  The bill was for a discovery, but the general question was whether an action would lie against the company for such a cause, the defendants contending that the acts complained of were done in the exercise of their functions as a sovereign power. The master of the rolls admitted that a suit could not be sustained in that court against a sovereign power, but held that the principle did not apply to the case.  He said that as a private company, the defendants had entered into a private contract, on which they must be liable.  If the chief justice had adverted to the well known character of the East India Company, he would have seen that the case was quite inapplicable.  It is a stock corporation, created for the purpose of trading with the native inhabitants of India,

NEW YORK PRACTICE REPORTS. 369

Darlington agt. The Mayor, &c., of New York.

making regular dividends on the stock, and managing its pecuniary affairs through a board of directors sitting in London. In process of time, and probably at the period of this decision, it had acquired or been permitted to exercise, vast powers of government, which powers have since been transferred to a board of control appointed by the crown. As a trading company, it was and is a private corporation, conducted for the purpose of individual emolument, and is no doubt, liable on its contracts with individuals in the same manner as natural persons or private corporations. The lease was a contract for trading with the natives, which the company had violated, and it had thus subjected itself to damages as a private company. The other cases referred to in the opinion of the supreme court, have not any direct bearing upon the question under consideration. If this case of *Bailey* agt. *The Mayor*, had rested where it was left by the supreme court, though I should be obliged to acknowledge my inability to appreciate the distinction suggested between the public and private functions of the city government, the judgment would have been entitled to a certain weight as authority. But a new trial took place pursuant to a judgment of the supreme court, when the plaintiff recovered a very large verdict, and the case was presented to the court for the correction of errors, whose judgment of affirmance is reported in 2 *Denio*, 433. The chancellor and three senators delivered written opinions in favor of affirmance, and the president of the senate an opinion for reversal. None of the opinions even allude to the ground taken in the opinion of the supreme court. It was considered by all the members who delivered opinions for affirmance that public corporations were responsible on account of their legal personality, and their capacity for suing and being sued for the negligent acts of their agents and servants in the execution of their duties; and the main question which was much discussed, was whether the relation of principal

and agent existed between the corporation and the engineers and others who constructed the dam, seeing that the water commissioners were appointed by the legislature. The chancellor was unable to make out that relation, and placed his opinion for affirmance on the ground that every owner of land who allows others to erect nuisances thereon, or suffers his premises to be in such a situation as to produce injury to others, is answerable for such injury; and as the city corporation were the owners of the land on which the dam was erected, he held they were liable upon that principle. Senator HAND considered the state as conducting the enterprise through the corporation, and said that a sovereign power, though it cannot be sued, yet if it become a member of a corporation, lays aside its sovereignty as to that transaction or character. Senators BOKEE and BARLOW considered that the corporation, by their acceptance of the act of legislature, constituted the water commissioners their agent by adoption. The liability of the defendants being established by the court of ultimate review on an entirely different theory from that which affirmed the enterprise of conveying water into the city to be private work as distinguished from an act of municipal government, the doctrine of the opinion of the supreme court was substantially repudiated, and cannot therefore be considered as a precedent. It is but the opinion of the eminent chief justice and his learned associates, and does not, like a final adjudication upon the cause of action, settle any principle of law.

The case of *Britton* agt *The Mayor, &c.* (21 *How. Pr. R.* 251), was decided in the former supreme court in 1843, while the late Nicholas Hill was the reporter, but it was not published in his reports. After being often referred to in manuscript, to prove the private character of the property held by the corporation, it was finally printed in *Howard's Practice Reports*, fifteen years afterwards. It was an action brought on a contract between the plaintiff and

common council, by which the former was to clean the streets in the city for a consideration agreed on. It was decided against the plaintiff on a demurrer to the complaint, on the ground that by the legal arrangement of the duties of the several branches of the city government, the work in question could not be made the subject of a contract, as such a method of proceeding would control or embarrass what is styled the legislative power of the common council. The soundness of that decision is not now in question, but in arriving at the determination, the chief justice took occasion to assert that many of the powers and privileges vested in the corporation were held by it as a private corporation, and that it held a mass of private rights and interests in property real and personal, in the same way that similar property was held by private persons, and the case of *Bailey* agt. *The Mayor, &c.*, was referred to as authority, that case not being then passed upon by the court of errors. So far as it was intended to assert that the management of, and bargaining respecting specific property owned by a municipal corporation, was substantially of the same character as that used by private persons and corporations in their transactions concerning similar property, the remarks were eminently just, and the assertion of that position was all which was essential to the argument of the opinion. That argument was, that the duty to provide for cleaning the streets was legislative in its character, and not properly the subject of contract stipulations, like arrangements which are made in the management of specific property owned by the city. There was nothing in this case which called for a determination as to the character of the ownership of such property, in respect to the distinction of public or private, or the power of the legislature respecting it. If any of the expressions of the chief justice can have the construction that such property owned by a municipal corporation is held, in all respects and in every aspect in which it may be viewed, or in

regard to the legislative authority over it, precisely like that held by private corporations or individuals, the language is unguarded and cannot be sustained.

The case of *Benson* agt. *The Mayor, &c.* (10 *Barb.* 223), is a special term decision of the late Judge BARCULO, denying the plaintiff's application for an injunction restraining the corporation of New York from granting certain ferry franchises between the city and Long Island. The plaintiff claimed to have grants from certain commissioners appointed under an act of the legislature, passed in 1845, and who were thereby authorized to grant ferry licences between the city and Long Island, but they were not to grant a license for any ferry or ferries which should interfere with the rights, franchises or privileges of the mayor, aldermen and commonalty of the city of New York, in and to any ferries already established, &c. The injunction was denied, on the ground that the grant which the commissioners had made to the plaintiff did interferere with the ferries already established by the corporation, and which were hence regarded as in excess of the powers of the commissioners, and in violation of the statute. This de- cision of course does not touch any question before us, but the learned judge prepared a long and able argument to show that the corporation held rights in the subject of ferries, which the legislature could not control. It is not worth while to examine at length the positions of an opinion wholly aside from the point decided. Many of the positions are incontrovertible, such as the rights of grantees of the corporation of existing ferries upon the footing of contracts, protected by constitutional provisions. So far as the opinion argues that the legislature cannot interfere, with the power conferred by the charter on the corporation, in regard to ungranted ferries, I should not be able to concur in all that is said. Indeed, the judge refrains from pronouncing definitely upon that branch of the subject.

In the case of *The People* agt. *Hawes* (37 *Barb.* 440), a

motion was made in the supreme court for a mandamus against the comptroller of the city, to compel him to pay the relator a large sum of money which had been awarded by arbitrators appointed pursuant to an act of the legislature, to determine what, if anything, they were entitled to receive from the city, for the breach of an alleged contract for the building of certain gate houses in the new reservoir of the Croton water works. The corporation had denied the legal existence of the contract, and refused to consummate it or to allow the relators to do the work, and the legislature thereupon passed the act in question, providing for an arbitration. The mayor joined in appointing arbitrators, but counsel for the city did not appear at the trial, upon which the award was made against the city upon an *ex parte* hearing. The special term denied the motion for a mandamus, on the single ground that it did not appear that the comptroller had any money of the city in his hands applicable to that object, out of which the award could be paid. On appeal to the general term, the order was affirmed. One ground of the affirmance, according to the opinions, was that if the relators had a demand against the city, there was a remedy by action, and that where such a remedy exists a mandamus will not lie. But the court, moreover, denied the power of the legislature to pass a law obliging the city to submit to an arbitration in such a case. That position was based upon the constitutional provision protecting private property, relied on by the defendant in the present case. If the transaction were between private persons, I doubt not but that this provision and the one preserving the right of trial by jury would have been fatal to the case. So if the corporation of the city had been a private corporation. But being public, and its charter and corporate franchises being subject to legislative control, I am of opinion that the legislature had a right of its own authority to create a board for the adjustment of the claim without the consent of the city. It

may be that they could not compel private parties inter-
ested to submit to such a tribunal, for they had a legal
right. to prosecute the city in a regular action, but the
legislature had full control over the city;

The subjects of the several actions in the cases I have
been examining, were as clearly matters of municipal gov-
ernment as any which could be presented. Nothing could
in the nature of things partake less of a private character
than the supplying of water to, and the cleaning of the
streets of a town containing nearly a million of inhabitants.
If these are not public subjects and under the control of
the legislature, the city is not subordinate to the supreme
legislative power on any conceivable subject. It is an
*imperium in imperio.*

Another case decided in a sister state, containing doc-
trines hostile to the views I have stated, may be mentioned
(*Atkins* agt. *The Town of Randolph,* 31 *Verm.* 226). The
legislature of Vermont, in a section of an act to suppress
intemperance, had enacted that a county commissioner
should be elected, and that he might appoint an agent for
each town, to purchase liquors on its account, to be kept
by the agent for sale for medicinal purposes, and all other
selling of liquors were prohibited. One Mann, was ap-
pointed the agent for the town of Randolph, and in that
character purchased liquors of the plaintiff on the credit
of the town, but had betrayed his trust, in not paying over
the proceeds of the sales made by him. The action was
brought to recover against the town the price of the liquors
so purchased. The court held the law unconstitutional, as
a violation of the provision protecting private property,
contained in the bill of rights, which was a part of the
constitution, and was in similar terms with the provision
of the constitution of this state so often mentioned. The
opinion of course denies the right of the state legislature
to make public regulations binding on the town without
the consent of the inhabitants, which involve an obligation

NEW YORK PRACTICE REPORTS. 375

Darlington agt. The Mayor, &c., of New York.

to pay money. It is opposed to the right invariably conceded here to make such regulations, and stands upon no principle. Its fallacy was exposed in an able dissenting opinion of one of the judges, which states the law upon the subject as I have endeavored to explain it (see *The People* agt. *Morris* 13 *Wend.* 325).

The foregoing are the principal cases bearing with any degree of directness upon the point whether specific property held by municipal corporations is subject to the law making power vested in the legislature, or whether it is protected against legislative action by the constitutional provision referred to. They have not in any respect shaken the opinion which I have above expressed. It is unnecessary to say whether the legislative jurisdiction would extend to directing the city property to other public uses than such as concern the city or its inhabitants; for this act, if the effect suggested is attributed to the judgment for riot damages, devotes the property which may be seized on execution to legitimate city purposes, namely, to reimbursing those who have suffered damages on account of the inefficiency of the city authorities to protect private property from the aggressions of a mob.

I am of opinion that the order appealed from should be affirmed, on the ground that the means provided by the statute to raise money to pay for the damages in question were not hostile to any provision of the constitution.

All the judges concurred, except DAVIES, J., who though for affirmance, dissented from some of the views of the chief judge, in respect to the corporate property, and INGRAHAM, J., who delivered an opinion for reversal.