(50 App. Div. 149.)

## MARSHALL v. CITY OF BUFFALO.

(Supreme Court, Appellate Division, Fourth Department. March 21, 1900.)

RIOT—BUILDINGS—DESTRUCTION—MUNICIPAL CORPORATIONS—LIABILITY—TRIAL —DIRECTION OF VERDICT.

Where a crowd of men, women, and children, numbering at times from 100 to 150, with tools of different kinds, invaded plaintiff's premises early in the morning, and demolished buildings thereon, and carried away the material, without notice or warning to plaintiff, such facts would have warranted a finding that the buildings were unlawfully demolished and removed with force and violence, by a riotous and disorderly mob, in defiance of law, within General Municipal Law, c. 17, § 21, declaring that cities shall be liable in damages for the destruction of property therein by a mob or riot without the owner's consent and contributory negligence, and hence the direction of a verdict for defendant, in an action against the city, was error.

Adams, P. J., and Williams, J., dissenting.

Appeal from special term, Erie county.

Action by Charles D. Marshall, as trustee, etc., against the city of Buffalo. From a judgment dismissing the complaint, plaintiff appeals. Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

Adolph Rebadow, for appellant.
William S. Jackson, for respondent.

LAUGHLIN, J.   This action was brought to recover the value of
property claimed to have been destroyed by a mob or riot.   The
plaintiff, as trustee, was the owner of premises situate on Hoyt and
Lyman streets, in the city of Buffalo, and of the buildings thereon.
The buildings consisted of a slaughter house 84 feet in length and
32 feet in width, an ice house 65 feet in length and 32 feet in width,
and a wagon shed and stable 80 feet in length and 60 feet in width.
Each building was 16 feet high, and was constructed of timbers,
joists, studding, rafters, boards, and shingles, forming a substantial
structure.   At the time of their destruction, the buildings were un-
occupied, and had not been occupied for several years.   The doors
and windows and some planks from the sides of the buildings had
been removed by the action of the wind and weather and by tres-
passers.   The buildings were otherwise in good condition, and were
worth between $3,000 and $4,000.   The material of which they were
constructed was first-class, and was worth $2,500 for the purpose of
removal, to be utilized in the reconstruction of other buildings.   On
Friday morning, the 30th day of July, 1897, a crowd of men, women,
boys, and girls, mostly Polish people, was seen upon the premises.
Some were upon the ground, and others on the buildings, with
shovels, axes, pickaxes, saws, and crowbars of all shapes and de-
scriptions, chopping, cutting, tearing, and slashing the buildings
down, and taking the material away in wagons drawn by horses.
They continued in this manner all that day and the next, working
until late each evening, if not all night.   Monday morning some of
the material still remained on the premises, and like operations
were resumed, and before noon every vestige of wood had disap-
peared, and nothing remained of these buildings but the bare foun-
dation walls of stone.   At times there were from 100 to 150 people
there engaged in demolishing these buildings and in removing the
material, and at one time the number exceeded 200.   The eyewit-
nesses say that the work was conducted with great activity and
haste.   It was in a resident district and business portion of the city.
There was no evidence of any previous threat or of any warning or
notice to the plaintiff until after the damage had all been done, and
the jury would have been justified in finding that he was free from
contributory negligence.   The evidence failed to disclose whence
these people came or whither they went, or as to where they took
the material, except the general statement of one witness that they
took it home, and it is evident that this was merely his inference.

The people who destroyed and removed these buildings were tres-
passers, and apparently committed the crimes of larceny and mali-
cious mischief.   Pen. Code, §§ 537, 538, 654.   The statute upon
which the liability of the defendant depends is section 21 of chapter
17 of the General Laws, known as the "General Municipal Law,"
which provides as follows:

"A city or county shall be liable to a person whose property is destroyed or
injured therein by a mob or riot, for the damages sustained thereby, if the

consent or negligence of such person did not contribute to such destruction or injury, and such person shall have used all reasonable diligence to prevent such damage, shall have notified the mayor of the city, or sheriff of the county, of a threat or attempt to destroy or injure his property by a mob or riot, immediately upon acquiring such knowledge, and shall bring an action therefor within three months after such damages were sustained. A mayor or sheriff receiving notification of a threat or attempt to destroy or injure property by a mob or riot shall take all lawful means to protect such property; and if he shall neglect or refuse, the person whose property shall be destroyed or injured, may elect to bring his action for damages against such officer instead of the city or county."

This statute is now substantially the same, so far as the question here presented is concerned, as the original enactment of 1855. Laws 1855, c. 428. At that time "riot" was not a statutory crime, and it may, therefore, be presumed that the legislature had the common-law definition in mind, but it is significant that the term "mob" was also used in the statute. The case is novel and important. It is inconceivable that such substantial, valuable buildings could have been torn down and removed by trespassers in the manner described, in the heart of a great city, without the knowledge of many law-abiding citizens and some members of the police force, who should have interfered. The plaintiff and others are taxed for the maintenance of the police department which has been created for the purpose of preserving peace and order and detecting and preventing crime. A taxpayer might have reasonably expected and demanded a sufficient degree of diligence on the part of the members of the police force to have discovered this assembled multitude, and to have prevented the destruction of this property. But that fact alone does not authorize a recovery, nor is it very material; for, if the destruction was by a mob or riot, the city is liable, regardless of whether the authorities had notice or could have prevented the damage. The only liability on the part of the municipality in the premises is that imposed by the statute, and therefore the sole question presented is whether the plaintiff was entitled to have the case submitted to the jury to find whether the property was destroyed by a mob or riot, within the meaning and intent of the statute. The word "mob" is not strictly a legal term, but a vernacular word, descriptive of a large and aggravated riot. 15 Am. & Eng. Enc. Law, p. 698. The Century Dictionary defines it as "a riotous assemblage; a crowd of persons gathered for mischief or attack; a promiscuous multitude of rioters." It is defined in the Standard Dictionary as "a turbulent or lawless crowd; a disorderly or riotous gathering or assembly; a rabble, throng; as, the excess of the mob." Bouvier, in his Law Dictionary, defines it as "a tumultuous rout or rabble; a crowd excited to some violent or wrongful act. The word, in legal sense, is practically synonymous with 'riot'; but the latter is the more correct term." It is also described as an unorganized assemblage of many persons intent on unlawful violence. Abb. Law Dict.

Section 449 of the Penal Code provides as follows:

"Whenever three or more persons, having assembled for any purpose, disturb the public peace, by using force or violence to any other person, or to property, or threaten or attempt to commit such disturbance, or to do an un-

lawful act by the use of force or violence, accompanied with the power of immediate execution of such threat or attempt, they are guilty of riot."

A comprehensive and frequently quoted definition of "riot" is that given by Hawkins in his Pleas of the Crown, viz.:

"A tumultuous disturbance of the peace by three or more persons, assembled together of their own authority, with an intent mutually to assist each other against any one who shall oppose them in the execution of some enterprise of a private nature, and afterwards actually executing the same in a violent and turbulent manner, to the terror of the people, whether the act intended were of itself lawful or unlawful."

In Blackstone's Commentaries (volume 4, p. 140), a "riot" is defined as follows:

"A riot is where three or more persons actually do an unlawful act of violence, either with or without common cause or quarrel; as, if they beat a man; or hurt or kill game in another's park, chase, warren, or liberty; or do any other unlawful act with force and violence; or even do a lawful act, as removing a nuisance, in a violent and tumultuous manner."

"A riot," says Bishop (2 Cr. Law, § 1143), "is such disorderly conduct in three or more assembled persons, mutually accomplishing an object, as is calculated to terrify others." According to Stroud and to Burrill, an unlawful act, committed with force and violence by three or more, constitutes a riot.

In Commonwealth v. Runnels, 10 Mass. 518, Parker, J., observed:

"The phrase, 'in terrorem populi,' is used by Hawkins as descriptive of the offense denominated a 'riot'; but it is clear that there may be a riot without terrifying any one. Lord Holt has given a distinction, founded in good sense, between those indictments, in which the words 'in terrorem populi' are essential and those wherein they may be omitted. He says that in indictments for that species of riots which consist in going about armed, etc., without committing any act, the words aforesaid are necessary, because the offense consists in terrifying the public, but in those riots in which an unlawful act is committed the words are useless. And, upon consulting the precedents, we find this distinction accurately observed, there being no averment of terror, where an actual violence is charged to have been violently committed. * * * To disturb another in the enjoyment of a lawful right is a trespass, and, if it is done by numbers unlawfully combined, the same act is a riot."

In Solomon v. City of Kingston, 24 Hun, 562, affirmed in 96 N. Y. 651, the court at general term, in construing the terms "mob" and "riot" as used in the statute, said:

"The defendant insists, in the first place, that there was no mob or riot, because the crowd assembled at first for a lawful purpose, and that there was no combination. But it is plain that, though the original purpose for which the crowd assembled was lawful, yet they might unite in unlawful conduct, and thus become rioters. 'If, in an assembly of persons met together on any lawful occasion whatsoever, a sudden proposal should be started, * * * or to do any other act of violence, * * * and such motion be agreed to and executed accordingly, the persons concerned cannot but be rioters, because their associating themselves together for such a new purpose is in no way extenuated by their having met at first upon another.' Hawk. P. C. bk. 1, c. 65, § 3; 22 Alb. Law J. 403. Nor was it necessary that there should be a leader. The crowd breaking into and pillaging the plaintiff's store were mutually aiding and assisting each other. The crowd broke in, kicked the door open, and went in through the door and the windows. Thus, there was a combined breaking into the store, and a joint act of the crowd."

In People v. White, 55 Barb. 606, a case often cited and quoted with approval, it was held that an assault committed by three or more, with a preconceived intent, constitutes a riot. It is well settled that such statutes are highly remedial so far as they provide compensation, and penal so far as they impose liability, and should be liberally construed to accomplish the purpose of their enactment. Davidson v. Mayor, etc., 2 Rob. (N. Y.) 240; Sarles v. Mayor, etc., 47 Barb. 447; Luke v. City of Brooklyn, 43 Barb. 54; Schiellein v. Board, Id. 490; Allegheny Co. v. Gibson, 90 Pa. St. 418; Pen. Code, § 11.

The liability does not depend upon the diligence of the public authorities. It is an extension of the ancient English law, which made the inhabitants of the respective hundreds liable for burglaries and unlawful destruction of property. The theory of the statute is that it is the duty of municipalities to preserve the peace and protect the property of all persons within their limits, and that imposing such liability would not only tend to incite the citizens and officials to greater vigilance, but that the compulsory payment of losses occasioned by riots would be a proper and just penalty for the negligence of which they have been presumptively guilty. The statute was intended to punish the inhabitants for permitting riots and unlawful assemblages, and to incite them to prevent and suppress the same by making it a matter of interest to the taxpayers to give their moral support to the enforcement of law and order. Eastman v. Mayor, etc., 5 Rob. (N. Y.) 389; Davidson v. Mayor, etc., 2 Rob. (N. Y.) 258, 259; Wolfe v. Supervisors, 11 Abb. Prac. 270; Moody v. Supervisors of Niagara, 46 Barb. 659; Luke v. City of Brooklyn, 43 Barb. 54; Sarles v. Mayor, etc., 47 Barb. 447; Darlington v. Mayor, etc., 28 How. Prac. 352, 31 N. Y. 164; Ely v. Board, 36 N. Y. 297; Allegheny Co. v. Gibson, 90 Pa. St. 418; City of Chicago v. Manhattan Cement Co., 178 Ill. 379, 53 N. E. 68; Spring Valley Coal Co. v. City of Spring Valley, 65 Ill. App. 571.

In Luke v. City of Brooklyn, supra, the court remarked that:

"The statute recognizes the duty and obligation of the state to secure and protect the property of the citizen from injury and destruction by lawless and riotous bodies of men, and in the event of its failure or inability to furnish such security and protection, from any causes other than the carelessness and negligence of the owners of such property, it imposes upon the political community,—city or county,—when such property shall be injured or destroyed, the further obligation of paying," etc. Page 56. "The duty and obligation of the state to provide for the safety of property against the destructive violence of mobs of lawless and riotous men is too plain for question; and the supplemental obligation imposed upon cities and counties to provide compensation for the injury or destruction which they could not or would not prevent is but another application of the same principle of public duty." Page 58.

It must be borne in mind that this is a civil action, and the plaintiff is not required to prove that the trespassers committed the crime of riot or any other offense. He is merely obliged to show, by a preponderance of evidence, facts and circumstances from which the jury may fairly infer that the property was destroyed by a mob or riot, within the spirit, true intent, and meaning of the statute. People v. Briggs, 114 N. Y. 56, 20 N. E. 820, 47 Hun, 266; Lewis v.

Shull, 67 Hun, 545, 22 N. Y. Supp. 484; Dean v. Raplee, 145 N. Y. 327, 39 N. E. 952.

The case of Duryea v. Mayor, etc., 10 Daly, 300, affirmed in 100 N. Y. 625, is distinguishable on the facts from the case at bar. There three or four boys, in the daytime, without any tools or implements, began tearing down the stoop of an old, unoccupied, wooden building. They were soon joined by from 50 to 75 other boys, ranging in age from 8 to 17 years. It was shown that they had no common purpose, and were merely gratifying individual propensities. The work was continued for only an hour, and the boys fled on the arrival of a police officer.

We should not be unduly governed or controlled by the application of technical rules or definitions, as in a criminal prosecution, but rather by a reasonable, fair, liberal, and, at the same time, prudent, interpretation of this remedial statute, imposing the obligation on the city on the one hand, and creating the right to compensation by the property owner on the other. In the case at bar the evidence does not show the preliminary movements of the crowd. It shows this promiscuous multitude assembled early in the morning, and collectively engaged in violating the law. It might fairly be inferred and found from the evidence that they were executing a common purpose to unlawfully demolish and remove these buildings, and that there was a preconcerted plan to that effect on the part of many, as evidenced by the various tools, appliances, and vehicles which they brought with them to enable them to accomplish such purpose. In determining whether the case should have been submitted to the jury, we must assume that these trespassers knew the law. The jury would have been warranted in finding from the evidence presented, and the inferences that might be legitimately drawn therefrom, that these buildings were unlawfully, and with force and violence, demolished and removed by a riotous or disorderly mob, or in a riotous or disorderly manner by a mob, and in the execution of a common purpose, and in defiance of law and order. If such are the facts, the damages were caused by a mob or riot, and the defendant is liable. While we find no exact precedent, we think that these extraordinary facts established a prima facie case of municipal liability, requiring submission to the jury, and this conclusion is neither in conflict with the theory of the statute nor the reasoning of the decisions.

The judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the event.

McLENNAN and SPRING, JJ., concur. ADAMS, P. J., and WILLIAMS, J., dissent.