Spring Valley Coal Co. v. City of Spring Valley.

## Spring Valley Coal Company v. City of Spring Valley.

1.  MOBS—*Recovery of Damages for Property Destroyed by.*—Under the act of 1887, entitled " An act to indemnify the owners of property for damages occasioned by mobs and riots " (Laws of 1887, 239), whenever any personal property, other than property in transit, is destroyed or injured in consequence of a mob or riot composed of twelve or more persons, the city in which such property is destroyed, is liable to an action by or in behalf of the party whose property is destroyed or injured, for three-fourths of the damages sustained.

2.  SAME—*Purposes of the Law.*—The object of the act of 1887, to indemnify owners of property for damages occasioned by mobs and riots, is to cause the discountenance of unlawful and riotous mobs by the people at large, and make it a matter of interest to property owners and tax-payers to give their moral support to the enforcement of law and order.

3.  SAME—*Requisites of the Plaintiff's Case.*—The fact that a riotous mob of more than twelve persons assemble for an unlawful purpose, break open a store building within the limits of a city, and destroy and take away property, makes out a *prima facie* case for the owner against the city under section one of the act, provided the proper notice has been given, as required by section six of the act, and that such destruction of property has not been occasioned or in any way aided, sanctioned or permitted by the carelessness of the owner, and that such owner has used all reasonable diligence to prevent such damage.

4. SAME—*Questions for a Jury.*—The questions as to whether the owner of property destroyed by a mob failed to properly defend it against the mob, whether the destruction was caused by his negligence or wrongful act, or whether he used reasonable diligence to save his property, are for the determination of the jury, but the jury must determine them reasonably upon the evidence before it, or the verdict will be set aside.

5. SAME—*Composed of the Employes of the Owner.*—The fact that the employes of the owner of the goods destroyed constituted the bulk of the mob can not be considered in determining the liability of the city.

6. OWNERS—*Of Goods Destroyed — Employment of Non-English-Speaking Foreigners not Negligence.*—It is not negligence for the owner (a coal mine operator) of goods destroyed by a mob to employ non-English-speaking foreigners to work for him, nor does he by doing so forfeit his right to protection under the law.

7. SAME—*Not Required to take Human Life.*—Negligence can not be imputed to the owner of property destroyed because he and his employes decline to take human life to save the property from destruction. They are only required to act as ordinarily careful and prudent men would have been expected to act under like circumstances.

8. SAME—*Not Required to Provide a Police Force for his Own Protection.*—It is not the duty of the owner to provide a police force of his own, or to assemble men under arms at his own expense, to obtain that protection which it is incumbent upon the city authorities to furnish and which it has the power to do. The employment of armed men by private persons or corporations is of doubtful propriety.

9. CIVIL AUTHORITIES—*Power to Protect Persons and Property.*—The law has wisely vested in the civil authorities the right, and gives them the power, to protect persons and property from lawless invasion and overpowering force, and if they have not the means to suppress riots and unlawful mob, they have the right and it is their duty to call upon the militia of the State, through the governor, as may be necessary.

10. STATUTES—*Construction of.*—The act of taking and carrying away property by a mob is a destroying of it within the meaning of the act of 1887 to indemnify the owners of property for damages occasioned by mobs and riots.

11. ULTRA VIRES—*Not a Defense.*—The fact that a corporation carried on a store not authorized by its charter, is no defense to an action by it against the city in which the store was located, for damages sustained in the destruction of such store by a mob.

12. JURISDICTION—*Constitutional Questions—When not Involved.*—The mere suggestion that a constitutional question is involved, or the attempt to raise it by an instruction to the jury, is not of itself sufficient to oust the Appellate Court of its jurisdiction.

**Trespass on the Case,** for property destroyed by a mob. Appeal from the Circuit Court of Bureau County; the Hon. DORRANCE DIBELL,

Spring Valley Coal Co. v. City of Spring Valley.

Judge, presiding. Heard in this court at the December term, 1895. Reversed and remanded. Opinion filed June 1, 1896.

A. R. Greenwood and Richard M. Skinner, attorneys for appellant.

Under the New York statutes, having the same object as the Illinois statutes, in a case where the mob, originally collected for the lawful purpose of seeing a fire near the plaintiff's premises, subsequently showed signs of a desire to break in upon his premises, which he was notified to vacate and remove his goods, but neglected to do so, but put up his shutters and locked the doors, and, the mob becoming boisterous, the plaintiff applied to the chief engineer of the fire department for protection, who turned a stream of water upon the crowd, when he was struck with a brick and retired for a revolver, the crowd then rushing upon the store, breaking into it and carrying away the plaintiff's stock, it was held that although the purposes for which the crowd originally assembled were lawful, yet there was no defense to the action, as they ultimately conducted themselves in an unlawful and wrongful manner. Solomon v. City of Kingston, 24 Hun, 562.

Property lost by plaintiff by being carried away by the mob and rioters is, within the meaning of the act, destroyed. Plunder as well as wanton injury is usually the work of such rioters. Solomon v. Kingston, 24 Hun, 562.

The duty and obligation of the State to provide for the safety of property against the destructive violence of mobs of lawless and riotous men is too plain for question, and the supplemental obligation imposed upon cities and counties to provide compensation for the injury or destruction of property, which they could not, or would not prevent, is but another application of the same principle of public duty. Luke v. Brooklyn, 43 Barb. (N. Y.) 54; Sarles v. New York, 47 Barb. (N. Y.) 447.

The act (making the county of Alleghany liable for property destroyed by mob) is both a remedial and penal statute and must be liberally construed. The fact that the county authorities are unable to quell a riot does not limit the lia-

bility of the county for damages done thereby.    County of Alleghany v. Gibson, 90 Pa. St. 397.

It is not necessary that the property owner should give notice to the county authorities, unless he has a knowledge of an intention on the part of the mob to destroy his property, and sufficient time intervenes to enable him to give the notice contemplated.    Such notice is not necessary where the authorities have knowledge of the intention or attempt to destroy property.    The act is intended to embrace every form of riotous disturbance, whether large or small.    County of Alleghany v. Gibson, 90 Pa. St. 397.

The inability of the sheriff to do what is necessary to suppress the riot, is not a defense under the New York Act of 1855, any more than his neglect would be a ground for it, the liability being, irrespective of either, imposed for the destruction of property by the riot, whether the sheriff has done all in his power or not to prevent it.    Wolf v. Richmond Suprs., 11 Abb. Pr. 270; 19 How. Pr. 370.

In an action under the New Hampshire statute, the illegal and improper conduct on the part of the owner of the property will not be presumed, and he need not prove the legality or propriety of his conduct.    Palmer v. Concord, 48 N. H. 211; 97 Am. Dec. 605.

The New York Act of 1855, exempting corporations from liability for injury to, or destruction of, private property, when such injury or destruction was occasioned, or in any manner aided, sanctioned or permitted by the carelessness or negligence of the person whose property was destroyed, and he had not used all reasonable diligence to prevent the injury complained of, was enforced in a case where the premises were alleged to have been kept for illegal purposes. Blodgett v. Syracuse, 36 Barb. 526.

The fact that the premises were kept for illegal purposes is no defense; the proper remedy in such a case being to remove the nuisance and not to destroy the property.    Moody v. Niagara County Suprs., 46 Barb. 659; 36 N. Y. 297.

OWEN G. LOVEJOY, attorney for appellee, contended that a city can not use public funds or levy taxes for a private pur-

pose. To compel one citizen, by levying a tax on his property, to pay for the property of another citizen, destroyed, injured or stolen by rioters, incendiaries or thieves, is none the less robbery, because it is done under the forms of law. Savings Association v. Topeka, 87 U. S. 655; Book 22, Co. Op. Ed. 461; Lowell v. Boston, 111 Mass. 472.

The appellant could only exercise the powers specifically enumerated in the certificate of its incorporation or necessary to carry those powers into effect. Buying and selling merchandise was not authorized by such certificate. Rockhold v. Canton Masonic Society, 129 Ill. 455.

Cities and other municipal corporations, although vested with authority to suppress riots, mobs and other disturbances, are under no common law obligation to pay for property destroyed or injured by mobs. Prather v. Lexington, 13 B. Mon. (Ky.) 559; Western College, etc., v. Cleveland, 12 Ohio St. 375.

To require the city of Spring Valley to pay the Spring Valley Coal Co. the value of property destroyed, damaged or taken away by rioters, most of whom were or recently had been the employes of said coal company, would be to compel such city to make a donation to a private corporation, which is forbidden by the Constitution. Washingtonian Home v. Chicago, 157 Ill. 414.

The validity of a statute and the construction of the Constitution was involved in this case, and the appeal should have been taken directly to the Supreme Court. County of Cook v. Industrial School, 125 Ill. 567; Whittaker v. Village of Venice, 150 Ill. 201; Williams v. The People, 118 Ill. 445.

Whether the looting of the store was occasioned or aided by the neglect of the plaintiff, and whether the plaintiff used all reasonable diligence to prevent the same, were questions of fact for the jury to decide. Pennsylvania Co. v. Frand, 112 Ill. 405; Railroad Co. v. Adler, 129 Ill. 340.

The legislature can not impose a burden or tax on a city without the consent of its corporate authorities. The act of 1887 attempted to impose such burden and tax. Updike v. Wright, 81 Ill. 53; Marshall v. Silliman, 61 Ill. 223; Gaddis v. Richland Co., 92 Ill. 126.

Statutes changing the common law or increasing the burdens of taxation are to be strictly construed. Canadian Bank v. McCrea, 106 Ill. 289; Chestnutwood v. Hood, 68 Ill. 139.

J. L. MURPHY, City Attorney, also for appellee, contended that the object for which the Spring Valley Coal Co. is formed, is to mine and sell coal and other minerals, fire-clay, stone and petroleum; to acquire by purchase or lease and to own, possess and enjoy as much real estate and personal estate as shall be necessary for the transaction of its business, and to sell and dispose of the same when not required for the uses of the corporation. Paragraph 5 of Chapter 32, R. S. (S. & C.), p. 268, Vol. 3. Corporations formed under this act may own, possess and enjoy so much real estate and so much personal estate as shall be necessary for the transaction of their business, and may sell and dispose of the same when not required for the uses of the corporation.

Corporations can make only such contracts as the legislature has authorized them to make. People v. L. N. R. Co., 120 Ill. 48.

Corporations have as incidental powers, only such as are necessary to carry out the objects for which they are formed. People v. The Chicago Gas Trust Co., 130 Ill. 268.

MR. JUSTICE CRABTREE DELIVERED THE OPINION OF THE COURT.

This suit was, in form, an action on the case, brought by appellant against appellee to recover damages for the loss of property destroyed by a mob in the city of Spring Valley, on the night of July 6, 1894.

The statute under which this action is brought, was passed in 1887, and in force July 1, 1887, and is entitled : " An act to indemnify the owners of property for damages occasioned by mobs and riots." Such portions of the statute as are applicable to the case at bar are as follows :

Section 1. " Whenever any building or other real or per-

sonal property, except property in transit, shall be destroyed or injured in consequence of any riot or mob composed of twelve or more persons, the city, or if not a city, then the county in which such property was destroyed, shall be liable to an action by or in behalf of the party whose property was thus destroyed or injured, for three fourths of the damages sustained by reason thereof."

Section 2. "Such action may be brought in the form of an action on the case, or other appropriate action, and whenever any final judgment shall be secured against any such city or county in any such action, the same shall be paid in due course as in case of other judgments."

Section 3. "No person or incorporation shall be entitled to recover in any such action if it shall appear on the trial thereof that such destruction or injury of property was occasioned, or in any way aided, sanctioned or permitted by the carelessness, neglect or wrongful act of such person or corporation; nor shall any person or corporation be entitled to recover any damages for any destruction or injury of property as aforesaid, unless such parties shall have used all reasonable diligence to prevent such damages."

Section 6. "No action shall be maintained under the provisions of this act by any person or corporation whose property shall have been destroyed *or* injured as aforesaid, unless notice of claim for damages be presented to such city or county within thirty days after such loss or damage occurs, and such action shall be brought within twelve months after such destruction or injury occurs."

So far as we are informed this law was the first legislation upon this subject ever adopted in this State.

Happily for the past welfare of our people, it is only of recent date that such laws have seemed to the legislature to be necessary. In the earlier history of Illinois, its inhabitants were, as a rule, peaceful, law abiding, contented and prosperous. As the State has increased in population, however, and become more densely inhabited, the competition for wealth on the one hand and the struggle for existence upon the other have been sharpened and intensified, sometimes

bringing capital and labor into serious conflict, while strikes
of great magnitude have, in the past few years, been not only
frequent, but such as to seriously threaten the peace and good
order of society.   On several occasions these strikes have
resulted in mobs and riots, and the destruction of much val-
uable property.   That unlawful and riotous mobs, and the
violence usually attendant thereon, might be discountenanced
by the people at large, it is by this law, made a matter of
interest to property owners and tax-payers, to give their
moral support to the enforcement of law and order, expe-
rience having frequently shown that people not directly in-
terested in the strike, nor in the riotous proceedings of those
engaged in an unlawful attempt to accomplish their ends
by violence, have, nevertheless, tacitly given their sanction
and support to the mob, when, had they used their influence
in favor of law and good government, and been willing to
assist the constituted authorities in suppressing the riot,
the more serious consequences would have been avoided.
No doubt considerations of this nature induced the legisla-
ture to pass the law in question.   In the older States, and
in England, such laws have been in force for many years.
Indeed as early as the reign of Edward I. of England, accord-
ing to Blackstone, when the kingdom was divided into hun-
dreds, a forfeiture was, by the statute of Winchester, im-
posed upon the hundred wherein a man was robbed, which
was meant to oblige the hundreds to make hue and cry after
the felon; and if they took him, they stood excused; but
otherwise the party robbed was entitled to prosecute them by
a special action on the case for damages, equivalent to his
loss.   And also of the same nature was the action given by
statute 9, Geo. I., C. 22, commonly called the "black act,"
against the inhabitants of any hundred, in order to make
satisfaction in damages to all persons who had suffered by
the offenses enumerated and made felony by that act.   3
Black Com. 160.

In Darlington v. Mayor, etc., of New York, 31 N. Y. 164,
which was a case similar to this, Denio, Ch. J., speaking for
the court, says:  "Laws of this general character have ex-

isted in England from the earliest period. It was one of the institutions of Canute the Dane, which was recognized by the Saxon laws, that when any person was killed, and the slayer had escaped, the ville should pay forty marks for his death; and if it could not be raised in the ville, then the hundred should pay it. ' This irregular provision,' says an able author, ' it was thought would engage every one in the prevention and prosecution of such secret offenses.' " Citing 1 Reeves' History of Eng. Law, 17.

. " * * * Passing by the statutes of subsequent reigns, and particularly several in that of Elizabeth, in which this remedy has been somewhat modified while its principle is steadily adhered to, we come to the seventh and eighth Geo. IV., Chap. 31, which was an act for consolidating and amending the laws of England relative to remedies against the hundred. It repeals several prior acts providing remedies against the hundred for the damages occasioned by persons violently and tumultuously assembled, and enacts a series of provisions very similar in effect with, and in some respects more extensive in their scope, than those of the statute under consideration."

* * * " These provisions," says the learned judge, " have no direct bearing on the present case, but are referred to, to show that the action in question is based upon a policy which is coeval with the laws of England, and one which has been constantly acted on in that country, and hence that it very clearly falls within the general powers of the legislature." This language is equally applicable to the case at bar, as to the one the New York court had under consideration. A similar statement of the origin and history of this class of laws, is to be found in County of Alleghany v. Gibson, 90 Penn. St. 397.

Whether such laws are wise and necessary, is a question for the legislature, and not for the courts; but in view of the occurrences of recent years, and the frequent apathy displayed by ordinarily good citizens at the destructive work of riotous mobs, it is not at all surprising that such laws are enacted.

The case was tried by a jury, resulting in a verdict finding the defendant city not guilty. A motion for new trial being overruled, judgment was entered on the verdict, and appellant brings the case to this court and insists on a reversal, upon the ground that the verdict was manifestly against the weight of the evidence, and the judgment thereon contrary to law.

Appellee has entered a motion in this court to dismiss the appeal for want of jurisdiction, which motion was taken with the case, and a decision thereon reserved until the hearing of the cause. The motion to dismiss will now be overruled. We do not think the constitutional question sought to be raised can be regarded as fairly debatable. Our attention has not been called to any provision of the constitution which the statute in question violates, nor do we know of any. The mere suggestion that a constitutional question is involved, or the attempt to raise it by an instruction to the jury, is not, of itself, sufficient to oust this court of jurisdiction. Chaptin v. Commissioners of Highways, 126 Ill. 264.

Were the rule otherwise it would always be in the power of parties, by their pleadings, or by asking instructions to juries, to apparently raise a constitutional question, deprive this court of jurisdiction, and permit them to go directly to the Supreme Court by appeal or writ of error. Such a holding might result in defeating the purpose for which Appellate Courts were instituted in this State. Subject, of course, to the final decision of the Supreme Court, we must determine for ourselves whether the constitutional question ought to be raised is fairly debatable and, if not, then we should retain jurisdiction.

The facts, as they appear from the evidence, are substantially as follows: The appellant is a company duly incorporated under the laws of this State, owning and operating extensive coal mines in the vicinity of the city of Spring Valley, and having in its service a large number of operatives employed in such mines. At the time of the alleged injury it also owned a store building and general stock of merchandise, in which the company carried on a mercantile

Spring Valley Coal Co. v. City of Spring Valley.

business, selling goods to its employes and such others as chose to trade at its store. Prior to April 25, 1894, there had been in the employ of the company, in its mines, from 800 to 1,400 men, largely composed of foreigners. About the date last mentioned, viz., April 25, 1894, a strike was inaugurated among the miners employed by appellant, and from that time on there seems to have been bad feeling existing on the part of the employes against the company, but whether this strike was in consequence of complaints against the appellant, or on account of sympathy with striking miners in other parts of the State, does not clearly appear from the evidence, nor is it very material, so far as this case is concerned.

The evidence shows that there had been, prior to the time when the injuries complained of were actually committed, various rumors to the effect that the strikers intended to loot the store of appellant, and that subject had been a matter of discussion among the officers of the company as well as the city authorities. On July 6, 1894, these rumors were again in circulation, and L. S. Blackley, the manager of the company store, testifies that he heard of it in the forenoon of that day, whereupon he went to see Mr. S. M. Dalzell, the general manager of the company, and had a consultation with him as to what should be done by way of protecting the property. That arrangements were made to have some of the office boys stay in the store, guns and firearms being obtained with which to protect the property against the mob. Mr. Blackley testifies further, that he went to see the mayor, Thomas B. Jack, and informed him of the rumors he had heard, that the mob were going to break into the store, and the company looked to him, the mayor, for protection. That about half past eight, or about half an hour before the trouble commenced, Mayor Jack came to the store and said that he had about twenty good men—"plenty of good men"—and he said to the witness, "We will take care of you," to which Blackley responded, "All right." The mayor further said he didn't think there was going to be any trouble, but if it did come it would be about twelve o'clock;

but the witness says he told the mayor if there was any trouble it would be earlier than that.   If we are not mistaken the evidence fails to show that Mayor Jack was seen again that night at the place of the disturbance and riot which followed, and the twenty men, or "plenty of good men," failed to put in an appearance to aid in quelling the riot or protecting the property of appellant at the time or after the attack was made on the store.   Soon after this interview with the mayor a riotous mob began to assemble on the street in front of the company's store, increasing in numbers until there were, according to the various estimates of the witnesses, from two hundred to five or six hundred men and women, apparently bent on mischief.   Michael Hicks, city marshal of appellee, who was sworn on its behalf, testified on cross-examination that there were some four hundred who took part in the riot.   That the crowd came in a body, and "it seemed as though they were organized beforehand, from the way they came up there."   They appeared to have a leader, a stranger to the witness, who was "hollering," "Come on, boys."   The witness arrested this man and was knocked down for his pains, and his prisoner rescued.   On his direct examination as to the same matter, the witness swears that when he made the arrest, he got hit with a couple of rocks, and was told if he did not leave the man alone, he (the marshal) would get killed. The witness then tried to find the mayor at his office, but did not succeed.   He then passed around among the men, and asked them to assist him in protecting the store.   That he thus asked some twenty or more, some of whom said they would do so if they had arms to protect themselves, but they would not go to get killed, while others would say they were "not going to protect the company's store."   He says the men around there who were not in sympathy with the mob were not very numerous.   About nine o'clock the attack upon the store began by some one throwing stones through the plate-glass windows and shouting to the crowd to "come on, boys; come on, everybody," when the rush was made for the inside of the building.   At this time, accord-

ing to the testimony of the witness L. S. Blackley, he was inside the store with Mac Weeks and Harry Hossack, armed with shotguns, and waiting for "something to happen." After the first stone was thrown "there was a lull for a few minutes and then there was a perfect fusilade of stones, and they smashed in the entire front, and smashed the show cases at the north end of the store."

He further says: "We waited around there a few minutes and a big rock, as big as my fist, came down to the desk and I told the boys I guessed we had better get out of there, and we started out. * * * From the facts that I knew and they knew, we discussed the matter over, whether we had better get out of there. We were afraid if we made a stand there we would be burned out, and the Pinkerton case, the manner they ill-treated Pinkerton, we knew that, and they had used some of our officers pretty hard, and we made up our minds that the best thing for us to do was to go out of there, and we were afraid. We discussed the matter whether we would have any protection from the outside and we were afraid of it; we didn't believe there would be any, so we left." Immediately after Blackley and his assistants left the building, the mob gained entrance into the store and the looting commenced. There is substantially no disagreement between the witness for appellant and appellee as to what took place after the crowd gained access to the goods in the store. The city marshal, Hicks, says that after the windows and door were mashed in, the men composing the mob went in and helped themselves; he says "the store was chock full of people, tramping over everything, some down in the cellar, and some all over." Peter Lauer, one of the aldermen of the city sworn for appellee, tells of the looting, and says the mob were carrying goods in every direction; that there were two or three hundred men and women; that the mob were plundering, carrying things away from the store from nine o'clock until a little after ten o'clock—about an hour; that he was there until half past eleven, when everything was quiet.

Leopold Frank, clothing merchant of Spring Valley, a

witness for appellant, testified that there were five or six hundred people in the crowd carrying away goods in all directions; that from two hundred to three hundred of the rioters passed in and out of the store in half an hour.

Mr. R. Robinson, postmaster of Spring Valley, at that time sworn for appellant, testified that there were two hundred people; from twenty-five to fifty rushing in and out of the store and carrying away goods.

In fact all the witnesses tell substantially the same story as to the looting of the store and the manner in which the mob broke in. It would serve no useful purpose to go into a more extended or detailed statement of the evidence, sufficient having been already stated to show the nature of the riot, and the destruction of property, out of which this suit had its origin, and concerning which there is no dispute. We think, however, the evidence established the following facts: That on the night of July 6, 1894, a riotous mob, composed of more than twelve persons, while assembled together for an unlawful purpose, broke open appellant's store building, in the city of Spring Valley, and destroyed and took away property belonging to appellant valued at from $7,000 to $9,000, and did damage to the real estate of some $185. These facts, being undisputed, make a *prima facie* case for appellant, under Sec. 1 of the act above quoted, provided the proper notice of claim was given under Sec. 6 of said act; and provided also, that such destruction or injury of property was not occasioned or in any way aided, sanctioned or permitted by the carelessness, or neglect, or wrongful act of appellant or its servants, and provided further that appellant used all reasonable diligence to prevent such damage.

By the stipulation of the parties made in open court, it was agreed that on July 6, 1894, Thomas B. Jack was mayor of said city of Spring Valley; that John L. Murphy was city attorney, and Charles J. Fay was city clerk of said city. And the evidence shows that notice of appellant's claim against the city was served on each one of the above named officials of the city, within thirty days from the date of the

loss or damage to appellant's property; which notice, as the same appears in the record, seems to have been in compliance with section six of the aforesaid act. In fact, no point is made by appellee as to the sufficiency of the notice. The principal point made by counsel for appellee in support of the verdict is, that the destruction of property and the injury complained of, was the result of appellant's own negligence or wrongful conduct, in various ways not very definitely pointed out, whereby the striking miners were provoked to ill feeling against the appellant company; and also, that when the attack on the store was made, it failed to properly defend against the mob. It is insisted that all these matters were before the jury, and that the question was one of fact for its determination, whether the injury and destruction were caused by the negligence or wrongful acts of appellant, as well as the further question, whether appellant used all reasonable diligence to save its property. It is true these questions were for the jury, but even a jury must find reasonably, upon the evidence adduced before them, or their verdict will be set aside in order that justice may be done. If the same arguments were made to the jury that are pressed upon us in this court, there is little wonder the verdict was against appellant. One of the counsel in his argument for appellee, uses the following language :

"It is a well known fact in the industrial history of this country, that the managers of coal mines have been in the habit of employing the ignorant and lawless offscourings of Europe, for the purpose of keeping down the wages of the law-abiding and more intelligent miners. These offscourings are numbered and tagged by their masters like beasts, and they are little, if any, above the quadrupeds in intelligence and below the latter in docility. * * * They are utterly foreign to our body politic, and they create disorder and disturbance, both industrial and governmental, wherever they go. Like the locust, the grasshopper and pestilence, they scourge every community upon which they descend. Bureau county, prior to the organization of this coal company and its bringing such offscourings into a portion

thereof, was a notably peaceable and law-abiding community. Since then the county has become noted for its disorders and riots, all due to the lawless employes of the appellant and other like companies and the management of such companies themselves." All of which might perhaps be a proper argument if addressed to Congress for the purpose of inducing it to place a restriction upon emigration, but so far as this case is concerned, we fail to appreciate its force. True, it appears that the mob which did the damage was mainly composed of foreigners, many of whom had been in appellant's employ, but so far as the evidence shows, they were lawfully in the United States and in Bureau county; being here, they must live, and it has never yet been the policy of our laws, or of our people, to refuse employment to those willing to earn their bread, whether they were "to the manner born," or what counsel chooses to call "the offscourings of Europe." Thus far we have invited all the world to come to our shores, and it has been for many years the proud boast of the American people that the downtrodden and oppressed of all lands could come here and under our flag find freedom and peace. Whether a continuance of our past immigration policy is wise or not is for the legislative branch of the National Government to decide, and one with which we have nothing to do, so far as this case is concerned. But counsel say again: "We contend that a coal company or other employers that induces such lawless offscourings to come into or stay in a community, by giving them employment therein, can not recover from the innocent tax-payers of that community compensation for damages done to the property of such employers by such employes. * * * It is apparent from the evidence in this case that the men who looted the store of appellant were such foreign offscourings, and that the appellant, by employing them and thus bringing or keeping them in the city, was the author and aider of its own despoliation."

If there is a word of evidence in the record showing that these foreigners in the employ of appellant had, prior to the time of this strike, proven themselves lawless or danger-

ous elements in the community of Spring Valley, or else-where, it has escaped our attention. In the employ of appellant, as testified to by Dalzell, the manager of the coal company, there were probably twelve or fourteen hundred miners of almost every nationality, viz.: Irish, Scotch, Welsh, English, German, French, Belgians, Italians, Polanders, and Lithuanians. How many of each does not appear from the evidence, but the witness says in his opinion a majority of them did not originally speak the English language. There is no evidence in the record as to the peculiar or distinctive traits of character of the men of these different nationalities, as, indeed, we could hardly expect there would be. We can not take judicial notice that any one or more of these various races of men are offscourings, and counsel does not even designate those which, in his opinion, come under that appellation; so that, even if the argument had any fair application to the facts of this case, under section three of the act under consideration, we do not see what the jury had to act upon from which they could impute negligence to appellant because of its having had these different foreigners in its employment. We are unable to perceive how the mere fact, standing alone, that appellant had in its employment a large number of men, mostly of foreign birth, placed it outside the pale of the law's protection. And yet, from this circumstance alone we are asked to sustain the finding of the jury, that appellant brought this trouble and riot upon itself, by its own wrongful act. For this, as we understand the argument of counsel is what the jury founded their verdict upon.

Again counsel says in his argument: "From the evidence in this case, the English speaking miners employed by the coal company—the Irish, Scotch, English, Welsh and American—took no part in looting the appellant's store. Had the coal company employed only such kind of labor there would have been no looting. It chose to employ vicious and lawless offscourings, and why should it not bear the consequences of its conduct?"

No doubt this kind of argument had its effect upon an

English speaking jury, and resulted in procuring the verdict which was returned; but, it can not, and ought not, to have any weight with this court. Under the law, as we have seen, appellant had the right to employ any of these foreigners who were lawfully in Bureau county, and applied to it for work. To operate the coal mines of this country requires a vast number of men, and, no doubt, coal companies, like other employers, obtain them as cheaply as they can, so as to make a profit on their labor. There is no law, however, which prescribes the qualifications of a coal miner as to education, intelligence or moral character. He need not, necessarily, be like a juror in this State, " free from all legal exceptions, of fair character, of approved integrity, of sound judgment, well informed, and who understands the English language." If mine owners must, at their peril, employ only those who can come up to this standard, or even those only who were born in English speaking countries, the probabilities are, there would soon be a coal famine of large extent prevailing throughout the United States. Much might be said as to what this country would have been to-day, and how its great works and improvements would have been accomplished, without the introduction of foreign labor, much of which may not have been of the highest order of intelligence or morality, but we forbear. We can not, however, give our assent to the proposition that it is negligence *per se* for coal mine operators to employ non-English speaking foreigners to work in their mines, nor that by doing so, they forfeit their right to protection under the law.

Appellee makes the further point that the agents and servants of appellant did not use all reasonable diligence to prevent the looting. We have already referred to sufficient of the evidence to show what the situation was, at the time the attack was made upon the store. Although the mayor had promised protection, and said he had plenty of good men to furnish it, the evidence fails to show that, beyond the unsupported efforts of the city marshal, there was any endeavor on the part of the city authorities, to assist in the

preservation of appellant's property. It is true there were three or four of the appellant's employes in the store, armed with guns, when the attack was made, and that, without firing a shot, they beat a retreat after the doors and windows were smashed in, and there was, therefore, nothing to prevent the entry of the mob. The contention seems to be, that it was the duty of these three or four men to resist a violent mob of five or six hundred, and, at the risk of their own lives, protect the company's property. Had they fired into the mob there would, no doubt, have been some of the rioters killed, and, in all probability, the lives of those who did the shooting would not have been worth a minute's purchase. The argument of counsel, in the face of the evidence, has failed to convince us that negligence should be imputed to appellant, because its employes did not take human life in an attempt to save the company's property from destruction. Did those employes at the time act as ordinarily careful and prudent men would have been expected to act under like circumstances? If they did, then there was no want of ordinary care, and, so far as that is concerned, it can not be said appellant failed to use all reasonable diligence to prevent such damage.

But it is argued that appellant knew from the rumors afloat that there was danger its store would be looted, and failed to make proper provision for its protection. What was its duty under the circumstances? The mayor, the chief officer of the city, and the head of the police force was notified of the danger and promised protection. Was it the duty of appellant to provide a police force of its own, to assemble a regiment of men under arms at its own expense, to obtain that protection which it was incumbent upon the city authorities to furnish, and which it had the power to do? We think not. The employment of armed men by private persons or corporations, for the protection of their own property, has been everywhere condemned in this and other States, and under the law of Illinois, it is at least doubtful whether any such right exists. The law has wisely vested in the civil authorities the right, and given

them the power, to protect persons and property from law-
less invasion and overpowering force, and if the civil au-
thorities have not the means to suppress riots and unlawful
mobs, they have the right, and it is their duty, to call upon
the militia of the State, through the governor, for such as-
sistance as may be necessary.   It is because the citizen has
the right to be protected in his personal property that he is
bound to contribute by way of taxes his proportion of the
costs of government, whether State or municipal, and we
are unwilling to give our assent to the proposition that he
must resort to force and violence at his own expense to
obtain that protection to which he is entitled under the
law.   We fail to see from the evidence wherein the appel-
lant was bound to do more for the protection of its prop-
erty than it did do.   It was to meet just such cases, we
apprehend, that this law was adopted.   Here was a violent
attack upon, and destruction of appellant's property,
scarcely a hand being raised by the city authorities to pre-
vent it.   We think the verdict of the jury was clearly
against the weight of the evidence, and how they could
have come to the conclusion they did under the law as
given to them by the court we can not see, unless it was
the result of passion and prejudice produced in their
minds by such arguments as those pressed upon us, which
we think unsound and untenable.   For the reason that the
verdict is against the evidence, we think the court erred in
overruling the motion for a new trial.   Inasmuch as the
cause will be tried by a new jury, we deem it proper to con-
sider the cross-errors assigned by appellee upon the action
of the court in giving instructions numbered one and four
for the plaintiff below, and refusing defendant's tenth,
eleventh, twelfth, thirteenth, fourteenth, fifteenth and
sixteenth instructions.

The second instruction given for plaintiff below told the
jury that the carrying away of the personal property of
the plaintiff by the mob of twelve or more persons, if they
believed from the evidence it was so carried away, was
within the meaning of the law, destroying it.   We think

there was no error in giving this instruction. The act of the legislature under which this suit was brought was both a remedial and penal statute, and should be liberally construed to effectuate the legislative will. County of Alleghany v. Gibson, 90 Penn. St. 397.

The case last cited is an interesting and instructive one, and well worthy of consideration in connection with various of the points made by appellee. In the case of Solomon v. City of Kingston, 24 Hun, 562, it was held that property lost by plaintiff, by being carried away by the mob and rioters, is within the meaning of the act, destroyed. We think this is but a reasonable construction to place on the act, and the court committed no error in so instructing the jury.

No specific objection is pointed out as to plaintiff's fourth instruction, and we see none. It correctly stated the law of the case to the jury and there was no error in giving it.

The tenth instruction asked by defendant and refused, would, if given, have told the jury that if the mob collected in front of plaintiff's store with the intent of stealing and carrying away some of the goods in the store, then under the circumstances the agents of the plaintiffs then in the store would have had the legal right, for the purpose of preventing the looting of such goods, to fire at such persons so entering said store, with the fire arms then possessed by said agents. Suppose this instruction contained a correct proposition of law (about which we do not deem it necessary to express an opinion), yet there was no error in refusing it. The effect would have been to mislead the jury, and cause them to think if such agents had the right to shoot, it was their duty to do so, or the company would be chargeable with negligence in not having properly defended against the mob. As we have said above, we do not regard it as the duty of appellant to have taken human life in the defense of its store. A man may, sometimes, in the defense of his home, or his castle, be justified in law, in the taking of human life, but we do not think juries ought to be told that it may be legally taken in the defense of property under circumstances such as appear in this case.

The eleventh refused instruction contained the proposition that property stolen was not property destroyed within the meaning of the law, and that the plaintiff could not recover therefor. As we have already seen this is not the law in our opinion, and the refusal of the instruction was not error.

The twelfth and thirteenth refused instructions are based upon the theory that it was beyond the corporate power of appellant to carry on a mercantile business and to buy and sell dry goods, clothing and other merchandise not necessary to enable the plaintiff to transact its legitimate business of mining and selling coal, and that the plaintiff could not recover for the injury to or looting of any such goods and fixtures as were not reasonably necessary to enable it to carry on the business of mining and selling coal and other products mentioned in its articles of incorporation. In other words, the contention is, that if the plaintiff was carrying on a business not authorized by the law of its incorporation, then the mob had a right to destroy the property used in conducting such business, and the plaintiff, under the law, had no remedy therefor.

We think this proposition is neither maintained by reason nor the adjudged cases; if the plaintiff exceeded its corporate powers, the law furnished a remedy, but it did not authorize a mob to destroy its property.

The case of Ely v. Supervisors of Niagara County, 36 N. Y. 297, was an action under a statute similar to the one now under consideration, to recover damages for the destruction of a dwelling house by a mob. The county in the court below offered to prove that the house destroyed was a notorious bawdy house, kept by the plaintiff as such; that it was the resort of prostitutes, thieves and murderers; that prior to its destruction a policeman of the town was found murdered in front of the house, and that he was so murdered by some one who made the house a resort, and during a drunken debauch therein; that when this fact became known the citizens were so enraged that in a body they assembled and destroyed the house. The court below rejected the offer, and

this ruling was affirmed both in the Supreme Court and the Court of Appeals, and a judgment of $4,500 for the destruction of the building was affirmed, all the judges concurring. Cited with approval in County of Alleghany v. Gibson, *supra.* It was also held in the New York case, cited above, that the wrongful conduct of plaintiff in keeping a bawdy house was not such carelessness or negligence within the meaning of the act, as proximately contributed to the injury or destruction of property.

The instructions under consideration were in conflict with the doctrine of these cases, and we think were properly refused.

The fourteenth refused instruction, if given, would have told the jury that if the plaintiff carried on a store, such as has been mentioned, when not authorized by its charter so to do, " and that by carrying on such business, and buying and selling such goods, the plaintiff aided the destruction, injury or larceny of such goods, then the plaintiff can not recover damages for the destruction, injury or larceny of such goods."

How the mere carrying on of such a store by the company, even if not authorized by the law of its incorporation so to do, could have aided its destruction in any proper sense or meaning of the statute we are unable to perceive. The instruction would have left the jury at liberty to give a construction to the statute, and what was meant by the terms "aided, sanctioned or permitted," contained in the third section of the act, which its framers never meant, and which would do violence to its spirit and intent. We think the court properly refused the instruction.

The fifteenth and sixteenth refused instructions would have told the jury, if given, that the act in question was unconstitutional and void, and the court properly refused to give them.

For the reasons given above the judgment will be reversed and the cause remanded.