NORTHERN ASSURANCE COMPANY, LTD., and others, Appellants, vs. CITY OF MILWAUKEE, Respondent.

*December 6, 1937—March 15, 1938.*

For the appellants there were briefs by *Wolfe & Hart* and *Z. F. O'Leary,* all of Milwaukee, and oral argument by *Mr. Francis J. Hart* and *Mr. O'Leary.*

For the respondent there were briefs by *Walter J. Mattison*, city attorney, *Chas. W. Babcock*, first assistant city attorney, and *Ronold A. Drechsler*, assistant city attorney, and oral argument by *Mr. Drechsler*.

The following opinion was filed January 11, 1938:

FOWLER, J.   Our disposition of the case only requires us to discuss the defendant's claims that regardless of other matters the judgment is correct because, (1) the cause of action under the statute is neither assignable nor, (2) subject to the law of subrogation; (3) the action does not lie because the streetcar company did not itself file a claim with the city council as required by the statute; and the claim of the plaintiffs that, (4) upon the evidence and the stipulated facts they are entitled to judgment according to the prayer of the complaint.

(1) Sec. 331.01, Stats., provides that actions "for damages done to real or personal estate" survive.   The damages involved are of that nature.   Whatever actions survive are assignable.   *Samuel Meyers, Inc., v. Ogden Shoe Co.* 173 Wis. 317, 181 N. W. 306.   The cause of action is therefore assignable.

(2) We held in *Patitucci v. Gerhardt*, 206 Wis. 358, 261, 240 N. W. 385, that the doctrine of subrogation applied where payment of a loss was made by an insurer under an automobile collision policy, and that such payment operated as an assignment of the claim of the insured against the tort-feasor responsible for the injuries to the insured.   The policies issued by the plaintiffs herein were to indemnify the streetcar company against loss through damage done by rioters and in effect the same as automobile collision policies which indemnify the insured against loss sustained in a collision.   The plaintiffs could therefore maintain the action had there been no formal assignment of the streetcar company's claim.

(3) The statute creating the liability involved provides that a claim for the damage done, "must be filed within six months" after the doing of the damage. The streetcar company did not itself so file such a claim, but the plaintiffs did. The defendant contends that as the claim was not filed by the streetcar company as distinguished from the plaintiffs, the action does not lie, and cites language from the opinion in *Long v. Neenah,* 128 Wis. 40, 44, 107 N. W. 10, in support of its contention. The language relied on is, "As we read the statute the notice required must be given by or on behalf of the person claiming damage." This was said, not in reference to the claim for damages to be filed within six months, but in reference to the notice covered by the language of the statute that the injured person "shall have immediately notified the mayor of the city . . . after being apprised of any threat or attempt . . . to do harm or injury to his person by any such mob or riot." A half dozen other citations are given in the briefs as supporting the defendant's contention, all which we have examined and none of which has any connection with the point involved. The statute only requires that "claim therefor must be filed within six months thereafter." Every purpose of the statute is fulfilled by the filing of the claim by the owner of the claim if it has been assigned. We are of opinion that the requirement of the statute was met by the filing of the claim by the plaintiffs.

(4) The portions of the statute material to the defense submitted to the jury read as follows:

"66.07   *Mob damage.*   (1) The county shall be liable for injury to person or property by a mob or riot therein, except that within cities the city shall be liable.   . . .

"(4) No person shall recover hereunder when the injury was occasioned or in any manner aided, sanctioned, or permitted by him or caused by his negligence, nor unless he shall have used all reasonable diligence to prevent the same,

and shall have immediately notified the mayor or sheriff after being apprised of any threat of or attempt at such injury. Every mayor or sheriff receiving such notice shall take all legal means to prevent injury, and if he refuse or neglect to do so, the party injured may elect to hold such officer liable by bringing action against him within six months of the injury."

The questions submitted to the jury followed the language of the statute. The findings were that the injuries involved were, (a) "occasioned, aided, sanctioned or permitted by acts of the employees" of the streetcar company, and (b) were "caused by negligence on the part of the employees" of said company.

It is to be observed that the statute by its terms imposes absolute liability upon the city unless the exempting conditions are present. That the city police made reasonable efforts to prevent injury, and that the police on the spot did all they could toward controlling the mob and protecting property, is immaterial. The city must not only endeavor to prevent injury but it must prevent it. Such is the plain import of the language of the statute. The courts in construing like statutes that have passed upon the point uniformly so hold. *Butte Miners' Union v. City of Butte*, 58 Mont. 391, 194 Pac. 149; *Marshall v. City of Buffalo*, 50 App. Div. 149, 64 N. Y. Supp. 411, 415; *County of Allegheny v. Gibson*, 90 Pa. 397, 35 Am. Rep. 674. Of the purpose of the New York statute from which our statute was taken it was early said that it "recognizes the duty and obligation of the state to secure and protect the property of the citizen from injury and destruction by lawless and riotous bodies of men, and in the event of its failure or inability to furnish such security and protection, from any causes other than the carelessness and negligence of the owners of such property, it imposes upon the . . . city . . . when such property shall be injured or destroyed, the further obligation of paying" the

full value thereof. The point is forcibly illustrated by the following quotation from *County of Allegheny v. Gibson, supra,* 35 Am. Rep. 677:

"Another instance is the Philadelphia riots of 1844. Here, again, the civil power was wholly inadequate to suppress the mob, and it was only put down at last by the stern use and display of the military arm. Said the late Judge KING, in his charge to the grand jury: 'Our city during these scenes of violence has exhibited the appearance of a town of war. . . .' The amount of property destroyed was large, for all of which, the county was held liable under the act of 1841. Later still, we have the draft riots of New York in 1863, when an entire army corps was withdrawn from the front, where it was sorely needed, to hold in check the rebellious elements of that city. In numerous cases the court of errors and appeals held the city liable. *Newberry v. New York,* 1 Sweeney, 369; *Davidson v. Mayor,* 2 Rob. 230; *Darlington v. Same,* 31 N. Y. 164. Some idea of the extent of the damages caused by the mob during this riot may be inferred from the fact that upon the argument of the case last cited, counsel representing the plaintiffs in nine hundred and fifty other cases were heard."

The statute involved in the *Gibson Case, supra,* was in its essential features like the instant one. Our own statute was taken with only slight changes, and those inconsequential, from the one involved in the New York cases above cited. See *Febock v. Jefferson County,* 219 Wis. 154, 158, 262 N. W. 588.

Passing to consider the questions particularly arising under the provisions of the statute above designated by (a) and (b) in the questions submitted to the jury, we have to construe the word "occasioned" in (a) and the proposition of negligence involved in (b).

(a) There is not a scintilla of evidence to indicate that the company either "aided, sanctioned or permitted" the injury to its property. Thus in any possible view there was no rea-

son for including these words in question (a). The question is further defective for using the phrase "of the employees of the company" following the word "acts" in the question, instead of the phrase "of the company." The company is not responsible for injury done by striking employees or employees in sympathy with the strikers. *Spring Valley Coal Co. v. City of Spring Valley,* 65 Ill. App. 571. The word "occasioned" in (a) merely means caused. Nothing can be said to "occasion" a result unless it caused it. The word "caused" merely connotes the relation of cause and effect. The word "occasioned" in (a) thus means the same as the word "caused" in (b). In order to absolve the city from responsibility the acts of the company that "occasion" or "cause" the injuries must occur at the time the injuries are done. There was admitted on the trial much testimony of the mayor of the city, all of which was wholly immaterial and, so far as it went to causation, was incompetent, that the injuries to the company's property were caused by acts of the streetcar company long antedating the doing of the injuries involved. The mayor testified, without objection on the part of plaintiffs' counsel, but it was not less improper and prejudicial because not objected to:

"I know that it was quite common knowledge and it was generally known that the T. M. E. R. & L., more than any other organization in the city, had broken laws of the city or attempted to evade the laws of this city up to that time [time of the strike]—the laws with respect to the United States concerning its dealings with its employees; their arrogant and belligerent attitude on innumerable occasions. As I recall . . . the National Recovery Act. Companies which complied with the act . . . were given a Blue Eagle. . . . At some time prior to the strike the electric company [the streetcar company] had a Blue Eagle. Some time prior to the strike . . . they had the Blue Eagle revoked. . . . I knew the cause of the violence. First of all the defiance of this company of the laws and franchises and the

laws and decisions of rate commissions from time immemorial. It has antagonized the people of this community towards this company. That is No. 1. Second it has antagonized Uncle Sam himself in the reasonable enforcement of a national law, a national policy. The treatment of the public for years gone by and particularly their attitude in defying the government during this crisis in trying to administer a policy that meant co-operation with its employees. They were viewed by the citizens of this town . . . as absolute law breakers who should be dealt with as no better than bootleggers. In other words, the people in some sections of the city, yes, in large numbers couldn't understand why people violating the law should be protected while we were out arresting a bootlegger."

This testimony had nothing whatever to do with the responsibility of the city for damage done to the streetcar company's property. The court gave no instruction to that effect, but left it to be considered by the jury as acts of the company constituting an "occasion" of the injuries and "negligence" on its part causing them. It would seem to need no citation of authority to show that all this was entirely beside the case. The acts of the company that exempt the city must be such as operate as a proximate cause. *Ely v. County of Niagara,* 36 N. Y. 297; *County of Allegheny v. Gibson, supra.* That a dwelling house destroyed is a bawdyhouse is no defense. *Ely v. Niagara, supra; Blodgett v. Syracuse,* 36 Barb. (N. Y.) 526. That the building destroyed is a slaughterhouse, in a residence district, giving out offensive odors, is no defense. *Brightman v. Inhabitants of Bristol,* 65 Me. 426, 20 Am. Rep. 711. That the company had refused to accede to the demands of its employees that brought on the strike is no defense. *County of Allegheny v. Gibson, supra.*

Coming to the particular acts of the company that are claimed to have caused the injuries at the Kinnickinnic yards, only two were urged upon the argument, and nothing

else under the evidence could with any show of reason be urged. These acts are referred to in the statements of facts preceding the opinion as the placing of chicken wire over streetcar windows, and the moving of streetcars past the entrance of the yard gates.

As to the chicken wire, it manifestly was put over the windows of the cars to avoid the breaking of glass by missiles and the injury of passengers by the missiles and broken glass during the strike, which began at 4 a. m. of June 26th. The president of the streetcar company so testified. The statute requires that an owner must have "used all reasonable diligence to prevent" injury to his property to be entitled to recover under the statute. The company might lawfully take such reasonable means as it saw fit to protect its property, both under the statute and independent of it. Doing what one has a lawful right to do cannot be considered a proximate cause of injury to his property. An act of the company that exempts the city from liability must be a wrongful act, and the streetcar company committed no wrong in using the chicken wire. Its use therefore cannot be considered to have "occasioned" the injury or to have been an act of "negligence" that caused it. We so hold, notwithstanding that a police officer testified that the crowd "resented the particular wire net on the streetcars," and that the mayor testified:

"And from the inquiries I made and the knowledge I had up to that time, it was unheard of to put chicken wire on the cars, deliberately to bring out crowds on the streets. There was no brains to it. There was no excuse for it in this town. It looked to me it was in anticipation to bring the crowds out on the streets. I was convinced of this point from what happened subsequently. That is admissible in evidence. I am positively convinced it was done for the purpose of trying to invite crowds on the street and then my experience has been general in hundreds of strikes all over the country, all with reference to streetcar companies, delib-

erately. The minute the chicken wire was off the streetcars the crowd dispersed. ' There was no trouble. If they had not had the chicken wire, there would not have been the crowds."

Consideration of the contention that the movement of the streetcars past the yard entrance was the "occasion" or "negligence" that caused the injuries to the streetcar company's property requires a statement of some of the occurrences immediately preceding and during the doing of the injuries. The defendant's claims in this regard rest upon the testimony of two police officers, Captains Sandow and Wesolowski. These officers were sent to the Kinnickinnic yards by their superior officer because there was "some trouble" there. They arrived, Sandow at 7:40 and Wesolowski at 7:30 p. m. Sandow testified that at that time three streetcars were stalled at the yard entrance, which were "having some difficulties." The cars were withdrawn from use after the rush hours of traffic, and were to be stored in the company yards. Two of them were "abandoned" by their operators, and one of them was right at the entrance with a motorman at the controls. "A great crowd had swarmed around there." Some one attempted to pull down the trolley of the head car, and Sandow took hold of him and undertook to take him "to the box," and "because of the unruly crowd and large numbers and not enough men to help" at that particular time, the crowd got the man away from him. No damage had been done to the cars at this time. Cars began coming in and collected for maybe an hour—abandoned by their operators. There had been some "throwing of some kind going on." A dozen or fifteen cars collected from the south. There had been "one arrest." A man with a hook to move switches told Sandow they were going to take the cars off the street. At the rear of the string of cars from the south was an interurban car

containing passengers. Sandow told the man the cars could not get through, because the cars were stalled at Greenfield avenue at the north. Before these cars began to pass the yard entrance no damage had been done to them. After they passed and were compelled to stop "quite a number of windows were broken." The crowd followed them as they passed the entrance. Sandow said it seemed to him the passing of the cars "caused a flare up." This statement, while not objected to, apparently was incompetent, as a conclusion of the witness, not a fact to which he could testify. It seems that some damage was also done to cars at this yard on the 27th as to which Sandow, over objection, testified that it "seemed" to him was influenced by reports of what had happened at the Fond du Lac avenue yards. The crowd during the trouble on the 26th reached twenty thousand people. The car operators who left their cars, and were bringing in their cash boxes, expressed sympathy with the crowd to get through.

Wesolowski testified that when he arrived a lot of people were running around in the streets. Several streetcars were stalled and couldn't get any further. Pickets were parading in front of the company's office at the yard. The witness with patrolmen tried to escort the stalled cars into the yard. He got several of them in. Someone said the cars should be moved north. When they went by the entrance the "crowd" got "very hostile." Stones were thrown and glass broken. The only thing the police did was to protect the crowd from being run over by the cars. Several passengers from the interurban car were escorted to safety by the police. On the 27th, another crowd gathered at the Kinnickinnic yards, about twenty thousand to twenty-five thousand people. "The people got very riotous and uneasy and they rushed the police." "Stones and bricks were hurled." "Windows were

broken." The crowd "hurled back" the police officers. Radio announcements were made of "riotous trouble and riots at the Kinnickinnic and Mitchell and at the Fond du Lac avenue barns," at which "some of the younger element would let out a yell."

Under these facts the company cannot be charged with acts that either constituted "negligence" or "occasioned" the injuries. The moving of the cars past the entrance was to get them off the street, which was manifestly required when they could not be gotten into the yards. An emergency existed. Assuming that streetcar company officials in authority ordered the moving of the cars, there is no testimony or evidence that it was not an exercise of judgment. If so, that the injuries would not have been done but for the moving of the cars, does not make moving the cars negligence. As stated above, the company was only doing what it had a right to do, and such acts cannot be considered as "occasioning" or constituting "negligence" causing the injuries. As said in *Allegheny County v. Gibson, supra,* 35 Am. Rep. 675, in reference to moving of cars of a railway company:

"It has never yet been held that the assertion of a legal right in a legal manner, in pursuit of a legal and ordinary business, was such 'improper conduct' [the words of the Pennsylvania statute] as would prevent the owner of property destroyed by a mob, from recovering its value. . . . But it is said the company reduced the wages of their employees, and in face of the dissatisfaction produced thereby endeavored to move their trains in opposition to the will of the mob. A more untenable position than this could not well be imagined."

The fact that rendered proper the moving of cars in the *Gibson Case* was accumulation of cars loaded with freight. With like reason the accumulation of cars on the street and the blocking of the movement of interurban cars, and the resumption of normal streetcar traffic in the particular street,

rendered proper the movement of the cars in the instant case. As said in the *Gibson Case* (p. 676):

"It [movement of the cars] was the duty, involving a legal responsibility on the part of the company, to forward it [the freight]. In doing so they were asserting a legal right and performing a legal duty."

So of movement of the cars here.

As to the injuries at the Fond du Lac avenue yards, the acts claimed by the defendant to have "occasioned" the injuries or to have constituted "negligence" causing them are that some one inside the yard was reaching over a wall and striking persons outside with an iron pipe, and that a momentary attempt was made to turn a hose on the crowd inside the yard. The defendant's contentions in this regard rest upon the testimony of Captain Peterson and Lieutenant Neustetter and Sergeant Kohlster. Officer Peterson testified that he arrived at 6 p. m. People were arriving at that time. Pickets were walking in front of the gates. At 7 o'clock a car came to go into the yard. The pickets blocked the entrance. Officers got the pickets from in front of the car and this car got in the yards. The officer sent for reinforcements. At the occurrence of the iron-pipe incident the superintendent of the yards "did everything in his power to co-operate" with the police, both in getting the man with the pipe away from the wall and the hose shut off. "Probably two men were sprinkled." The pipe incident and the hose incident occurred at the same time. The crowd became unmanageable, and the injury to the property began at that time. The first act of disorder was the blocking of the car by the pickets. The injury to property "started after the pipe incident and the water."

Lieutenant Neustetter testified to the same general effect, but says nothing about the iron pipe or hose incidents. The trouble started when pickets attempted to stop a car from

entering a gate at the office or station entrance of the yard. This car entered. Attempts were then made to take cars in at another gate. This "seemed to arouse the spectators and pickets." Three or four cars were gotten into the yards. Sergeant Kohlster's testimony also was to the same general effect as Captain Peterson's. When they began to try to put cars into a gate other than the one at the office "that is where the crowd broke loose." When a car went in at that gate "some of the crowd went through the yards to 35th street." He observed "they [the crowd] were taking the motormen off the cars and leaving the cars in the streets. Some fuses were pulled out, but some wires were connected." He went into the yards and asked the men in the yards if they wished to help pull the cars off the street. The men so asked were employees working in the yards. Four of five cars were pulled in. "Then it got too hot and for their own protection I decided it was best for them not to take another chance because they were in with the strikers." There was a crowd of four thousand or five thousand "taking the motormen off of the streetcars and having them sign up right there." Two windows had been broken before this time. As to the iron-pipe incident, he testified that he was with Captain Peterson. Pickets were in the crowd going into the yards, and a man was standing at the concrete wall. A party complained that he had a pipe and was striking some of the men who were along side the wall. Later he observed "the parties having a hose in their hands," but "I did not see them squirting the water." Up to that time the crowd was under control. After that "there was no hold to them." The man with the pipe was on the streetcar company's property. The witness had seen him in the yard from time to time. After four or five cars were gotten into the yard "they [the men he asked for help] wouldn't take no more relations to instructions, and I anticipated some trouble and thought it was best not to go

further; that they would be endangering themselves trying to get the stuff in."

We cannot give to these two trivial incidents, the use of the pipe and the abandoned attempt to use the hose, mere momentary occurrences during the proceedings of a rioting mob, the effect of operating as acts of the company that "occasioned" the injuries to its property or constituted negligence that caused such injuries. The whole story as detailed by the evidence of the officers above stated shows a mob bent on mischief, and it was only a matter of time and sequence when the rioting must result more or less in injury to the property of the company, a part of whose employees were on strike. The crowd was manifestly largely comprised of strikers and persons in sympathy with them, and moved by animosity toward the company. Neither of the acts relied on are shown to have been ordered or directed by the company or anyone having authority to order them. They are not even shown to have been done by employees of the company. The use of the pipe as claimed is even not shown to have been made at all. To permit such incidents to be treated as exempting municipalities from the operations of the statute would be to disregard the purpose of the statute, and to sanction its evasion. It would be no less than a flouting of the statute.

*By the Court.*—The judgment of the circuit court is reversed with directions to enter judgment in accordance with the prayer of the complaint.

A motion for a rehearing was denied, with $25 costs, on March 15, 1938.