A. & B. AUTO STORES OF JONES STREET, INC., *ET AL.*, PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS, v. CITY OF NEWARK, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

Argued December 22, 1970 and January 11, 1971—
Decided June 30, 1971.

6

8

*Mr. Roger A. Lowenstein,* Assistant Corporation Counsel, argued the cause for appellant and cross-respondent (*Mr. William H. Walls,* Corporation Counsel, attorney).

*Mr. Herman D. Michels, Mr. Marvin A. Sachs,* and *Mr. Stanley M. Teich* argued the cause for Committee of Attorneys for respondents and cross-appellants (*Messrs. Herman D. Michels, Samuel A. Gennet, Marvin A. Sachs, Stanley M. Teich, Bernard Shurkin,* attorneys; *Messrs. C. David Witherington* and *Leonard Rosenstein,* on the brief; *Messrs. Michels, Schwartz and Maher,* attorneys for respondents and cross-appellants).

The opinion of the Court was delivered by

WEINTRAUB, C. J. This appeal involves some 450 suits pressing thousands of claims against the City of Newark arising out of widespread disorders in that City between July 12 and 17, 1967. The actions were consolidated for trial and have been handled by a committee of attorneys with the understanding embodied in a court order that all parties will be bound by the determination in these proceedings.

Plaintiffs urged two bases for liability: (1) that the City was negligent in its handling of the disorders, and (2) that the disorders were riots within the meaning of a statute, to which we will later refer, imposing liability upon the City without regard to fault. The trial court disposed of some issues by motion before trial. 103 *N. J. Super.* 559 (Law Div. 1968). The case then went to trial without a jury with respect to common issues of fact and law. The trial court decided that the City could not be held in negligence but was chargeable under the riot statute. 106 *N. J. Super.* 491 (Law Div. 1969). It reached these *"Conclusions"*

with respect to the statutory action (106 *N. J. Super.* at 514):

> In consideration of all the evidence and the reasonable inferences therefrom, the court finds that there were many tumultuous disturbances of the peace in the Central, South, West and North Wards of the City of Newark between July 12 and 17, 1967. These disturbances involved groups of black persons in varying numbers in excess of three, who used force and violence to accomplish the common purpose of the militant blacks in a racist upsurge to destroy and injure the property of the white segment of the community. Although the disorders took place in various sections of the city and involved different mobs and bands, nevertheless they were all part of a cohesive movement wherein one group was inspired by and gained courage from other groups. And through the psychological and physical support of large menacing numbers, many individuals were enabled to set fires, to destroy, to enter and to loot with impunity.
>
> The court finds from the overwhelming undisputed evidence that these disorders constituted a general 'riot' or a series of 'riots' within the reasonable meaning and intent of the applicable legislation, and that these 'riots' caused untold damage to real and personal property through fires, physical destruction, pillaging and looting.
>
> These findings bring to a close the proceedings in the consolidated cases so far as they can be determined on common issues of fact and law. Henceforth, the individual cases will be set down for hearing on the remaining issues of damages and causal relationship between the riots and the damages. At those hearings, the city may assert the statutory defenses involving contributory negligence and notice requirements to the extent that they may be supported by evidence applicable to any of the particular claimants.

The disorders did not subside until after a large contingent of the New Jersey State Police and some 3,400 members of the New Jersey National Guard were sent to aid the local police forces. The nature and extent of the disorders are reflected in these statistics (106 *N. J. Super.* at 513–514):

> 24 persons killed
> 1200 persons injured
> 1029 business establishments damaged
> 29 residences damaged
> 62 major fires
> 24 sniper incidents reported
> Total arrests: approximately 1500
> Many confiscated weapons, including revolvers, rifles, shotguns and knives.

The order entered on those findings being interlocutory, the parties sought leave to appeal. Leave was granted, and we certified the City's appeal and the plaintiffs' cross-appeal before argument in the Appellate Division.

I

It is convenient to deal first with the trial court's holding that plaintiffs cannot prevail on the theory of negligence, 106 *N. J. Super.* at 493–499, which plaintiffs challenge on their cross-appeal.

We agree with the trial court's treatment of the issue. Its opinion gathers the pertinent cases in our State. 106 *N. J. Super.* at 493–499. See also *Willis v. Department of Conservation and Economic Development*, 55 *N. J.* 534, 539–540 (1970). The barrier is not a technical doctrine of governmental immunity from suit, but rather the absence of a substantive basis for imposing liability. This is so because ultimately plaintiffs challenge administrative or legislative decisions of a discretionary character, and it would be intolerable to burden those decisions with a dollar liability whenever a trier of the facts disagrees with them. Hence in jurisdictions in which the doctrine of sovereign immunity from suit as such has been abandoned or eroded, it nonetheless remains true that an action will not lie to recover riot damages upon a charge of negligence with respect to discretionary decisions made by the authorities. *Susman v. City of Los Angeles*, 269 *Cal. App.* 2d 803, 75 *Cal. Rptr.* 240 (Ct. App. 1969) ; *Silver v. Minneapolis*, 284 *Minn.* 266, 170 *N. W.* 2d 206 (Sup. Ct. 1969) ; *Westminster Investing Corp. v. G. C. Murphy Company*, 296 *F. Supp.* 1300 (D. D. C. 1969), affirmed, 434 *F.* 2d 521 (D. C. Cir. 1970) ; Note, "Riot Insurance," 77 *Yale L. J.* 541, 551–552 (1968).

II

Hence plaintiffs may prevail only if their claims come within the statute imposing liability upon municipal en-

tities for mob or riot damages. Our statute, *N. J. S. A.* 2A:48–1 to 7, was initially adopted in 1864 (*p.* 237) and was entitled "An Act to provide for compensating parties whose property may be injured or destroyed in consequence of mobs or riots." The statute was substantially similar to laws theretofore enacted in Pennsylvania and New York. *Clark Thread Co. v. Hudson County,* 54 *N. J. L.* 265, 266 (Sup. Ct. 1892).

No doubt our statute was prompted by "the draft riots of New York in 1863, when an entire army corps was withdrawn from the front, where it was sorely needed, to hold in check the rebellious elements of that city." *County of Allegheny v. Gibson,* 90 *Pa.* 397, 418, 35 *Am. Rep.* 670, 677 (Sup. Ct. 1879). New York City was held under the statute and paid riot damage claims totaling $1,216,209.55. Milton, *Abraham Lincoln and the Fifth Column* (Vanguard Press 1942), *p.* 152.

There were contemporaneous reactions to the draft in our State. As related in Knapp, *New Jersey Politics During the Period of the Civil War and Reconstruction* (1924), *pp.* 96–97:

"Although no draft was set for July, 1863 in New Jersey, the draft riots of that month in New York City were not without echo in New Jersey, for in Newark there were demonstrations on July 13, the opening day of the New York riots. The home of Provost-Marshal Miller was assailed, and the office of the *Newark Mercury* was attacked and stoned. A proclamation by Mayor Moses Bigelow and speeches by prominent citizens of the city cooled the excitement. On July 14 demonstrations were made in many places throughout the state against the draft, but they proved to be unimportant."

On July 15, 1863 the Governor of New Jersey issued a proclamation calling for calm, and 12 days later he issued another proclamation telling the people that "No draft has been ordered in New Jersey" and urging enlistments and the payment of bounties to that end. *L.* 1864, *pp.* 796–797. Those events were the backdrop against which the Legislature adopted the 1864 statute.

*N. J. S. A.* 2A:48–1 (prior to an amendment in 1968 to which reference will be made later) read:

When, by reason of a mob or riot, any property, real or personal, is destroyed or injured, the municipality if it has a paid police force, in which the mob congregates or riot occurs, or, if not in such a municipality, the county in which such property is or was situate, shall be liable to the person whose property was so destroyed or injured for the damages sustained thereby, recoverable in an action by or in behalf of such person.

*N. J. S. A.* 2A:48–2 prescribes a three-month limitation for suit, subject to an exception for infants. *N. J. S. A.* 2A:48–3 reads:

If it appears at the trial that the destruction of or injury to the property was occasioned or in any manner aided, sanctioned or permitted by the negligence of the claimant, there shall be no recovery. Nor shall a recovery be had unless the claimant used all reasonable diligence to prevent the destruction or injury and shall have, immediately after being apprized of a threat or attempt to destroy or injure his property by a mob or riot, notified the mayor or chief executive officer or chief of police of the municipality or the sheriff of the county, as the case may be, of the facts brought to his knowledge.

*N. J. S. A.* 2A:48–4 provides:

The mayor or officer or sheriff shall, upon receiving the notice, take all legal means to protect the property attacked or threatened. The expenses incurred by any of such officers in the performance of any duty hereby imposed shall be paid by the county treasurer of the county in which the property is situate, upon the approval thereof by a judge of the county court of such county.

*N. J. S. A.* 2A:48–7 provides:

A municipality or county, having paid damages for the destruction of or injury to property under this article, either upon a judgment therefor or as a settlement, may recover the full value of the property destroyed or injured by action against any or all persons engaged or in any manner participating in the mob or riot and the amount of judgment or settlement shall be prima facie evidence of the value of the property destroyed or injured.

14

## A

■■ Defendant urges the statute applies only when the police force of the municipality is adequate to cope with the disorder. Defendant would distill that limitation from the fact that municipal liability depends upon the existence of a paid police force, and the further fact that the statute requires the property owner to notify the authorities of a threat. Neither provision implies such a restriction upon the reach of the statute, and the story of the adoption of the statute strongly repels it, for, as related above, the act, which is patterned upon the New York statute, was adopted in the wake of draft riots in New York City which required a call upon a whole army corps.

Initially the 1864 statute imposed liability upon cities and upon the county if the mob or riot damage was inflicted outside a city. The statute was later amended to transfer liability from the county to any municipality which had a paid police force. Although municipal liability is thus identified with the existence of a paid police force, the Legislature did not thereby introduce a notion of culpable neglect. Not a word of the statute conditions the liability of either a county or a municipality upon the relative strengths of its enforcement staff and the mob. The reference to a paid police force, rather than the prior reference to cities alone, was intended to enlarge the number of municipalities which should absorb the losses which theretofore fell on the county. The Legislature could have used some other means of identifying the municipalities to be charged. No one suggests the technique employed has led to an irrational classification of municipalities. The only point urged is that the mention of a paid police force should be read to impute the condition that the threat shall not exceed the capacity of the constabulary. The legislative objectives seem to be several. One was to deter riots by subjecting the rioters and their neighbors, directly or indirectly, to the tax burden ensuing upon a riot. Another objective· was to

induce vigilance within the community, and it was probably in that light that a municipality, rather than the county, was made responsible if it had a paid police force. The final, and no doubt the main, objective was to spread the burden of those criminal events among the citizens of a municipality or a county as the case may be, and this upon a policy decision that it is just to spread the losses of the phenomenon of mob and riot disorders. This last objective is reflected in the title of the 1864 statute, "An Act to provide for compensating parties whose property may be injured or destroyed in consequence of mobs or riots." Fault is not implicit in any of these objectives.

The early precedent for such liability was the *Statute of Winchester* of 1285 which made each of the inhabitants of the "hundred," a local subdivision, liable to the victim of robbery. Liability did not depend upon blame. The purpose was to achieve a composite social objective in which the shifting and spreading of the loss was conspicuous. Speaking of the Pennsylvania riot statute of 1841, the court in *County of Allegheny v. Gibson, supra,* 90 *Pa.* at 418–419, 35 *Am. Rep.* at 677–678, said:

The Act of 1841 is both a remedial and penal statute. It is remedial, so far as it provides for compensation to the person whose property has been destroyed, and penal, so far as it throws the burden of that compensation upon the municipality within whose borders the destruction took place. It is but an extension of the ancient English law, which made the inhabitants of the respective hundreds responsible for robberies committed therein. Formerly, as we have seen, a person robbed had his remedy against any inhabitant of the hundred; that is to say, the inhabitants were jointly and severally liable. Then the law was so changed, that damages recovered against an individual could be assessed against all the inhabitants, so as to compel contribution. Afterward it was still further modified so as to give the right of action against the hundred. The principle upon which this legislation rested was that every political subdivision of the State should be responsible for the public peace and the preservation of private property; and that this end could be best subserved by making each individual member of the community surety for the good behavior of his neighbor and for that of each stranger temporarily sojourning among them. The effect was to make each citizen a detective, and on the alert to prevent as well as to detect and

punish crime. There was no exception in favor of robberies committed by overwhelming numbers, and by such a show of force as to overawe and overpower the limited constabulary of the hundred, or such as were committed by strangers. In either case the hundred was liable to the person robbed, however difficult or impossible it might be for the inhabitants to anticipate or prevent it. It was evidently a police regulation, based upon grounds of public policy, and enforced without regard to the hardships of particular cases. Our Act of 1841 is also a police regulation, and rests upon like grounds of policy.

Although a few jurisdictions provide otherwise, the prevailing statutory scheme does not turn upon fault and hence it is of no moment that the mob or riot overwhelmed the earnest efforts of the local police force. Annotation, 26 *A. L. R. 3d* 1198, 1248 (1969); Note, "Riot Insurance," 77 *Yale L. J.* 541, 553–554 (1968). It was precisely upon that view of an Illinois riot statute that its constitutionality was assailed, unsuccessfully, under the due process and equal protection clauses in *Chicago v. Sturges*, 222 *U. S.* 313, 32 S. Ct. 92, 56 *L. Ed.* 215 (1911).

Hence we see no difficulty in the application of the statute merely because the participants in the mob action or riot are so numerous. We agree with the trial court, 106 *N. J. Super.* at 506, that our statute would not cover an insurrection or rebellion, "a movement accompanied by action specifically intended to overthrow the constituted government and to take possession of the inherent powers thereof." *Home Insurance Company of New York v. Davila*, 212 *F.* 2d 731, 736 (1 Cir. 1954). And it may well be that the statute would not apply if a mob action or riot, although not intended itself to unseat government, was part of a calculated plan to achieve that end by cumulative attacks. But it would not be the numbers of individuals involved that would spell the difference, but rather their objective, and this upon the thesis that the statute was not designed to charge the local community with the burden of violence directed to that end.

Far more difficult is the situation in which the number of participants is small. Our statute is silent in this

respect. Indeed there is no definition whatever of a mob or a riot. The definition may well vary with the subject matter. The common law crime is defined as "a disturbance of the peace by three or more persons unlawfully assembled together and acting in a violent and tumultuous manner." *State v. Lustig*, 13 *N. J. Super.* 149, 152 (App. Div. 1951). For that purpose, three may suffice, for such conduct upon the part of that number may warrant punishment and it does not matter whether the offense is called rioting or something else. A statute, *N. J. S. A.* 2A:126–1 to 3, which makes it a misdemeanor to be part of a mob assembled to offer violence to the person or property of one supposed to have violated the law or for the purpose of exercising correctional or regulative powers over a person by violence and without lawful authority, specifies a collection of five or more individuals, and so also does *N. J. S. A.* 2A:48–8 which makes the municipality, or county, liable to victims of such mob action. Those statutes, which deal in the vernacular with lynching, are precise with respect to the aim of the participants, and in the light of the statutory objective it is appropriate to say that such conduct on the part of a small number shall be actionable. Still another statute, *N. J. S. A.* 2A:126–4 to 7, deals with unlawful assemblies and punishes a failure to disperse after the reading of the statutorily prescribed command to do so. For the purpose of that statute, *N. J. S. A.* 2A:126–4 requires a minimum of 12 if armed and a minimum of 30 if unarmed.

We need not attempt to set the minimum number of participants required by the statute involved in the present case. We can readily infer from the history and the evident limited role of the statute that it may not be applied to a common criminal event committed for the private gain or gratification of the offenders merely because they number three or more. "Mob" and "riot," however difficult to define, are lay terms and connote something more than and different from a joint violation of a penal statute. Usually there is present an element of reaction to or protest because

of some political, social, racial, ethnic, or economic issue which affects the rioters in a common way. Although we are reluctant to say the common cause must always be of that character, we think it correct to say that its absence would lead a court to consider carefully whether the participants could be said to constitute a mob or the event a riot in the lay sense of those words.

Sundry definitions of a riot are collected by the trial court in its opinions, 103 *N. J. Super.* at 565–566 and 106 *N. J. Super.* at 500–502, and they need not be repeated here. From them the trial court distilled "the conclusion that a riot is simply a tumultuous disturbance of the peace by a group of three or more persons having a common purpose who act in concert to accomplish their purpose through force or violence." 106 *N. J. Super.* at 502. Subject to the caveat we have already expressed concerning the inclusion of ordinary criminal events, we modify that definition to stress (1) that the number of participants must be sufficient to constitute a mob in the lay sense of that word; (2) in addition to the violent and tumultuous character of the event, it must appear that the disturbance operated to the terror of the people. These modifications do not affect the integrity of the trial court's decision. Its findings amply include all of the required ingredients and the record overwhelmingly sustains those findings.

C

Defendant urges that if, as we have just said, the statute does impose liability without fault, then the statute violates the due process and equal protection clauses of the Fourteenth Amendment, in saddling the losses upon the taxpayers of the municipality or county rather than upon the State as a whole. Defendant's argument has much legislative appeal, but the decision is the Legislature's and we note that after the Newark riots and the institution of the present suits, the Legislature reconsidered this statute and concluded that it should remain, with however a monetary limita-

tion and the exclusion of claims covered by insurance. *L.* 1968, *c.* 386. Thus we have a fresh legislative redetermination of the underlying policy question.

■ It is not for the judiciary to override legislative decisions because their policy may be unappealing. The only question for us is whether the statute is so devoid of arguable merit as to exceed the constitutional restraints upon the Legislature. As already noted, statutes imposing community responsibility for criminal events have been part of the Anglo-American scene for some 600 years. Although the setting has changed, there nonetheless remains room for a policy decision that communal liability will tend to deter riots because of their ultimate dollar burden upon the rioters and their neighbors, and will inspire local concern for the solution of problems out of which disorders might erupt. And with respect to the spreading of the losses upon a segment of the public, it remains within the reasonable discretion of the Legislature to decide what group of taxpayers shall share in the burden, just as the Legislature does with respect to so many other matters (the cost of welfare, education, police protection, the judiciary) as to which political arguments may be made that responsibility should be statewide or nationwide.[1] This is not to say that we individually applaud the legislative decision, but rather that we cannot say the Legislature went beyond constitutional boundaries in putting the onus upon the taxpayers of the locality. In constitutional terms, the scene today is not distinguishable from the scene in which such legislation was sustained in *Chicago v. Sturges, supra,* 222 *U. S.* 313, 32 S. Ct. 92, 56 *L. Ed.* 215, and the other cases which rejected sundry constitutional attacks. Annotation, 13 *A. L. R.* 751, 758–761 (1921).

---

[1]There is some movement to have States compensate victims of certain crimes. Thus far, the statutes adopted do so on a modest basis. In our State, Senate No. 15, which was passed by both Houses and awaits the Governor's action, is of that character.

## D

By *L.* 1968, *N. J. S. A.* 2A:48–1 was amended to read (the amendment is italicized) :

When, by reason of a mob or riot, any property, real or personal, is destroyed or injured, the municipality if it has a paid police force, in which the mob congregates or riot occurs, or, if not in such a municipality, the county in which such property is or was situate, shall be liable to the person whose property was so destroyed or injured for the damages sustained thereby, recoverable in an action by or in behalf of such person, *in an amount not to exceed $10,000.00 for the aggregate of damage done to all such property, both real and personal, at each separate location within a municipality, provided; however, that no person, and no subrogee of such person, having insurance coverage in whole or in part for the said destruction or injury, shall have a cause of action against such municipality or county at common law or pursuant to the provisions of this act. For the purpose of this section, insurance coverage means insurance obtained through any source whatsoever, including insurance purchased through any insurance pool, placement facility, plan of operation, or any other plan established pursuant to Federal or State law.*

The amendatory act became effective on January 2, 1969, which was after these actions were brought and before the entry of the interlocutory judgment now under review. Defendant did not assert before the trial court that the amendment applied to existing claims for relief, but that issue is advanced before us on this appeal. We are asked to hold (1) that the statute bars subrogation to a claim of a riot victim, and (2) that the claims are subject to the monetary limitation of $10,000. Because of the public interest, we will accept the issue although it was not timely raised. *State v. Perricone,* 37 *N. J.* 463 (1962), *cert.* denied, 371 *U. S.* 890, 83 *S. Ct.* 189, 9 *L. Ed.* 2d 124 (1962).

Defendant says the Legislature may withdraw a riot statute and bar actions for accrued claims for damages. Defendant cites *Louisiana ex rel. Folsom v. New Orleans,* 109 *U. S.* 285, 3 S. Ct. 211, 27 *L. Ed.* 936 (1883), which may be said to go part of the way. There the legislature reduced the taxing power of the city so that no revenues remained

to satisfy the judgments against the city under a riot statute. The majority opinion of Mr. Justice Field held that the contract clause of the Federal Constitution was not violated, saying that the riot statute was "simply a measure of legislative policy, in no respect resting upon contract, and subject, like all other measures of policy, to any change the Legislature may see fit to make, either in the extent of the liability or in the means of its enforcement," and that "The obligation to make indemnity, created by the statute, has no more element of contract in it because merged in the judgments than it had previously" (109 *U. S.* at 288, 3 *S. Ct.* at 213, 27 *L. Ed.* at 937). With respect to the due process clause, Mr. Justice Field, pointing out that the judgments continued to be existing liabilities, concluded that there could be no issue as to the taking of a property right merely because the taxing power was at the moment insufficient to provide for their payment. Mr. Justice Bradley concurred on the broad ground "that remedies against municipal bodies, for damages caused by mobs, or other violators of law, unconnected with the municipal government, are purely matters of legislative policy, depending on positive law, which may at any time be repealed or modified, either before or after the damage has occurred, and the repeal of which causes the remedy to cease," and that "In giving or withholding remedies of this kind, it is simply a question whether the public shall or shall not indemnify those who sustain losses from the unlawful acts or combinations of individuals; and whether it shall or shall not do so, is a matter of legislative discretion; just as it is, whether the public shall or shall not indemnify those who suffer losses at the hands of a public enemy, or from intestine commotions or rebellion." 109 *U. S.* at 291, 3 *S. Ct.* at 215, 27 *L. Ed.* at 938. Mr. Justice Harlan dissented, holding that a judgment is a form of "contract" within the protection of the contract clause and alternatively that a judgment is property within the due process clause and that the property is taken when all remedy for enforcement is withheld.

It is fair to say that none of the opinions in that case suggests a doubt as to power of the Legislature to wipe out a claim under a riot statute at any time prior to the entry of a final judgment. The Illinois Supreme Court has held that a riot act claim, not reduced to judgment, may constitutionally be defeated by the repeal of the statute, finding that no "vested right" is involved in a statute creating a special remedy against government. *Shelton v. City of Chicago,* 42 *Ill.* 2d 468, 248 *N. E.* 2d 121 (1969), *cert.* denied, 396 *U. S.* 906, 90 S. Ct. 222, 24 *L. Ed.* 2d 182 (1969). See also *United States ex rel. Rodriguez v. Weekly Publications, Inc.,* 144 *F.* 2d 186 (2 Cir. 1944), upholding a legislated reduction made prior to judgment of an informer's share of a recovery for a postal violation.

 Of course, the Legislature did not repeal the riot statute by the 1968 amendment. It amended the statute, and it is the amendment which defendant seeks to have applied retroactively. The difficulty is that the Legislature did not provide expressly or by implication that the 1968 amendment should apply to existing claims. See *N. J. S. A.* 1:1-14 and 15; *Becker v. Adams,* 37 *N. J.* 337, 341-343 (1962); *O'Neill v. Hoboken,* 73 *N. J. L.* 189 (Sup. Ct. 1906). On the contrary, the Statement annexed to the bill reads:

This amendment is not intended to indicate a legislative determination as to whether or not subrogation is presently permitted pursuant to N. J. S. 2A:48-1. Insurance companies writing property insurance coverage for damage due to mob or riot have recently been granted a 3-½% surcharge for this coverage by the Department of Banking and Insurance. Moreover, since the enactment of Ch. 129, P. L. 1968, individuals will be able to obtain insurance coverage for properties in areas subject to mob or riot damage notwithstanding this environmental hazard. Coverage will be provided at manual or tariff rates so long as the property is otherwise insurable. The insurers writing such coverage are able to participate in a Federal reinsurance program and have, in addition, a state fund to 'back-up' any catastrophic loss.

In light of the foregoing, it appears unfair to permit property owners or their insurers, as subrogees, to also have redress against the municipality for loss due to mobs or riots. Therefore, this amendment immunizes the municipality from suit by an insured or his subrogee at common law and also deprives such persons of any

statutory cause of action that might have been available under the original statute. The $10,000 limitation seems appropriate under the circumstances and will serve to aid municipalities in obtaining insurance coverage for this statutory liability.

The theme of the Statement is that the amendment would be propective only, it being left to the judiciary to decide upon its own principles whether subrogation was available with respect to existing claims. Although the Statement thus speaks only of so much of the amendment as deals with subrogation, it would be strained to say the amendment was nonetheless intended to be retrospective with respect to the new monetary limit of $10,000. We conclude, therefore, that the amendatory act did not touch the claims here involved.

E

We turn then to the question whether subrogation is warranted under the statute as it existed before the 1968 amendment. The trial court held the carriers are entitled to be subrogated to their insureds' claims against defendant. 103 N. J. Super. at 567–571. We believe they are not.

Subrogation is an equitable doctrine to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it. Standard Accident Ins. Co. v. Pellecchia, 15 N. J. 162, 171 (1954); Brewster & Son v. Catalytic Construction Co., 17 N. J. 20, 28 (1954). When, as here, an insurance carrier which has satisfied a loss it was paid to cover, seeks to recoup by asserting a claim its insured has against another with respect to that loss, the final question must be whether justice would be furthered by that course.

The trial court concluded that justice would thus be served. The basis was its proposition that "Under the riot statute * * * the city in effect is a wrongdoer." 103 N. J. Super. at 571. If the statute does deem the municipality a "wrongdoer" in any causative sense, it might well follow that the paid insurer or surety ought to be reimbursed by

the governmental entity whose culpable action or inaction thus transmuted the carrier's contractual promise into an actual liability. The critical question is whether the statutory liability does rest upon culpability in any sense relevant to this scene. We think it does not.

As we said above, the statute imposes liability without regard to whether a municipality is at fault. The city must indemnify the victim of a riot even if the city's performance was flawless. Nor would it matter that a riot ran plainly beyond any conceivable local capacity to handle it. Thus, although it probably is true that riot statutes are intended to stimulate a preventive concern, nonetheless negligence is not the touchstone of liability. Other objectives are evident. As we have already noted, one is to deter local residents from rioting by imposing a dollar liability upon them and their neighbors. Another, and probably the ultimate, basis of such statutes is a policy decision that the community, rather than the individual victim, should absorb losses of such origin. The community is thus an involuntary surety. Speaking of a riot statute, Lord Mansfield said in *Ratcliffe v. Eden*, 98 *Eng. Rep.* 1200, 1202 (K. B. 1776):

* * * This is the great principle of the law, that the inhabitants shall be in the nature of sureties for one another. It is a very ancient principle; as old as the institution of the decennaries by Alfred, whereby the whole neighborhood or tithing of freeman were mutually pledges for each other's good behaviour. The same principle obtains in the Statutes of Hue and Cry. It is the principle here.

It is significant that our statute provides in *N. J. S. A.* 2A:48–7 that the municipality "may recover the full value of the property destroyed or injured by action against any or all persons engaged or in any manner participating in the mob or riot." That provision repels the notion that the municipality was deemed to be a joint tortfeasor with the members of the mob or the rioters, for although abstractly there could be a legislative finding of different levels of actual fault and a decision upon that basis to visit the loss

ultimately upon the primary wrongdoer, see *Public Service Electric and Gas Co. v. Waldroup,* 38 *N. J. Super.* 419, 431 (App. Div. 1955), the more credible thesis is that the Legislature intended the municipality to be a surety only, and on that premise to be indemnified by the actual culprits.

Thus the contest here is between a surety paid to absorb a riot loss and an involuntary surety, the taxpayers of the community, who received nothing for their assigned responsibility and who will not profit a penny if the loss remains with the carriers who contracted for that very liability.

If the situation is thus viewed, it is hardly the just course to permit the paid insurer to transfer the loss to the City, or to put it in other terms, to say the statute was intended to make the City a surety for a paid insurer. Yet two English cases did take that view. In *Mason v. Sainsbury,* 99 *Eng. Rep.* 538 (K. B. 1782), the insurers who paid a riot loss, sued the hundred in the name of their insured. Without referring to his exposition in terms of suretyship in *Ratcliffe v. Eden* quoted above, Lord Mansfield held the insurer may recover, saying (*p.* 540) :

\* \* \* The case is clear: the act puts the hundred, for civil purposes, in the place of the trespassers; and, upon principles of policy, as in the case of other remedies against the hundred, I am satisfied that it is to be considered as if the insurers had not paid a farthing.

Justice Willes agreed, saying (*p.* 540) that the hundred "cannot be considered as free from blame. They may have been negligent, which is partly the principle of the Act." That case was followed in *Clark v. The Inhabitants of the Hundred of Blything,* 107 *Eng. Rep.* 378 (K. B. 1823), where the court commented that to permit the insurer to recover would further the legislative intent "to make the inhabitants of hundreds vigilant for their own sakes, by making it their interest to prevent the commission of offenses, and where that could not be done, to exert themselves to bring the offenders to justice," the court noting the provision of the English statute which relieved the hundred of liability

if the offender was apprehended and convicted within six months (*pp.* 378–379). Thus, in those cases, it was found either that some element of fault might exist or that it would defeat the purpose of the statute if subrogation were denied.

We are referred to *Agudo v. Monterey County,* 13 *Cal.* 2d 285, 89 *P.* 2d 400 (Sup. Ct. 1939), which, however, we find not to be in point. The action does not appear to have been brought by or on behalf of an insurer. The plaintiff was simply the assignee of a number of individuals who suffered riot losses, and the question was whether the statutory liability of the county was "penal" within a rule prohibiting the assignment of a claim for a penalty. Nor do we think *Dworak v. Tempel,* 17 *Ill.* 2d 181, 161 *N. E.* 2d 258 (Sup. Ct. 1959), is persuasive here. There it was held that an insurer was subrogated to the claim of its insured against a tavern which sold intoxicating liquor to the offending driver in violation of a dramshop law. The tavern keeper was there chargeable with wrongful conduct which in fact contributed to the injury.

Subrogation was permitted to a claim against a parent liable by statute up to $500 for his child's malicious destruction of property. *General Insurance Company of America v. Faulkner,* 259 *N. C.* 317, 130 *S. E.* 2d 645 (Sup. Ct. 1963). The basis seems to have been that since juvenile delinquency is attributable to the neglect of a parent and the statutory liability is imposed to encourage continued parental supervision, it would defeat the legislative aim to relieve the defaulting parent because the victim of the child happened to carry insurance. Again there is a concept of fault, and the further finding that subrogation would further the legislative intent.

Of interest is *Sun Indemnity Co. of New York v. Board of Education,* 264 *App. Div.* 73, 34 *N. Y. S.* 2d 475 (2d Dept. 1942). An insurance carrier which covered a negligent school teacher was denied subrogation to the teacher's statutory right to receive indemnity from the board of education. In denying subrogation the court found the statute was in-

tended for the benefit of the teacher alone, and hence it would not be equitable to permit the teacher's insurance carrier to succeed to the teacher's right and thus pass the loss to the board.

The trial court relied upon *Northern Assurance Co., Ltd. v. City of Milwaukee,* 227 *Wis.* 124, 277 *N. W.* 149, 151 (Sup. Ct. 1938), where the court held the insurer should be subrogated to riot damage claims against the city. However, after the trial court's decision in the matter now before us, the Supreme Court of Wisconsin overruled its earlier case. *Interstate Fire and Casualty Co. v. City of Milwaukee,* 45 *Wis.* 2d 331, 173 *N. W.* 2d 187 (1970). In doing so, the Wisconsin court concluded that realistically "the city is not the equivalent of a tort-feasor." It added that if the carriers succeeded, they would be recouping partly at the expense of the insureds who paid the premiums since the insureds would have to share in the resulting tax burden if the City reimbursed the carriers. In these circumstances, the court held it inequitable to permit subrogation. It found support in *William Burford & Co. v. Glasgow Water Co.,* 223 *Ky.* 54, 2 *S. W.* 2d 1027 (Ct. App. 1928), where a fire insurance carrier was denied subrogation to the insured's claim against the water company for failure to maintain adequate pressure. There, noting that the fire was not caused by the water company; that when the insurer paid it was not satisfying a debt of the water company; and that if the carrier prevailed, the insured who paid the premiums would share in the payment of his own fire loss through increased water rates, the court concluded it would be unjust to permit subrogation.

We think the result reached by the Wisconsin Supreme Court in its recent decision is the correct disposition of the issue. The city is not a wrongdoer. On the contrary, as we have already shown, it is chargeable as an involuntary surety for the actual wrongdoers, with a stated statutory right to be indemnified by them. Thus, we repeat, the contest is between a paid insurer and an unpaid one. We do not believe that the paid insurer was the intended beneficiary of this

statutory liability. The remote likelihood that subrogation would further a legislative purpose to induce local vigilance is not enough to justify subrogation against a community made a statutory surety without regard to fault.

Plaintiffs claim affirmative evidence in *N. J. S. A.* 2A:48–1 of an intent to permit subrogation since the statute states the municipality "shall be liable to the person whose property was so destroyed or injured for the damages sustained thereby, recoverable in an action by *or in behalf of such person."* Plaintiffs say the words we have italicized expressly refer to an action by an assignee or a subrogee. The words, however, are not "in the name of," but rather "in behalf of." We find no implication in the words used that subrogation was contemplated. An action "in behalf of" a person (here the victim of the mob or riot) imports an action brought for his beneficial interest, and not one brought for the beneficial interest of someone else.

For these reasons, we are satisfied the statute was not intended to benefit the insurer of the property, and that it would be inequitable to permit the insurer to shift to the city the loss the insurer bargained to pay.

### III

Plaintiffs raise a number of matters in their appeal with respect to the city's liability under the riot act. We think the trial court's handling of those issues was correct.

The trial court refused to take judicial notice of the fact of a riot, the very factual event which plaintiffs alleged to have occurred. 103 *N. J. Super.* at 564–567. The trial court having found for plaintiffs, the question is academic, at least in view of our affirmance of that fact finding. In any event, the trial court properly required plaintiffs to adduce proofs establishing a mob or riot within the scope of the statute.

The trial court held the statute covered losses resulting from theft and looting, but did not embrace losses from

business interruption, loss of profits or good will or other losses of an intangible nature. 103 *N. J. Super.* at 576–584. Plaintiffs of course accept the holding as to theft and looting but dispute the exclusion of intangible claims. We agree with the trial court's treatment of both issues.

Plaintiffs moved before trial to strike the separate defense that plaintiffs, "after being apprized of a threat or attempt to destroy or injure his property to a mob or riot," did not immediately notify "the mayor or chief executive officer or chief of police of the municipality * * * of the facts brought to his knowledge," as required by *N. J. S. A.* 2A:48–3. The motion was not supported by affidavit. The trial court correctly denied the motion. 103 *N. J. Super.* at 584–585.

After the trial of the common issues of fact at which the trial court found there were riots within the meaning of the statute, the trial court directed that the cases be set down for hearing on the remaining issues of damages and causal connection between the riot and the damages, and added that at the hearings, "the city may assert the statutory defenses involving contributory negligence and notice requirements to the extent that they may be supported by evidence applicable to any of the particular claimants." 106 *N. J. Super.* at 514. Plaintiffs apparently contend the trial court should have struck the separate defense upon the basis of the record made at the trial. But, we gather, the trial was not focused upon that issue, and defendant is entitled to be heard even though, from what we now know, it would be remarkable if defendant succeeded in showing that any claimant knew something material which defendant did not know or that notice from a claimant to defendant could have had the slightest impact upon what happened. So, too, with respect to the separate defense under *N. J. S. A.* 2A:48–3 which provides that if "the destruction of or injury to the property was occasioned or in any manner aided, sanctioned or permitted by the negligence of the claimant, there shall be no recovery," which plaintiffs ask us to strike on this appeal,

the chances of defendant's success seem remote. Yet the issues were not tried or decided by the trial court. The orderly course is to permit the hearing.

The interlocutory judgments are accordingly modified in part and affirmed in part and the matters remanded to the trial court for further proceedings not inconsistent herewith.

*For modification in part and affirmance in part*— Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, HALL and SCHETTINO—5.

*For reversal*—None.